Ralph SWAN, Movant
Below–Appellant,

v.

STATE of Delaware, Respondent
Below–Appellee.

No. 247, 2010.

Supreme Court of Delaware.

Submitted: July 20, 2011.
Decided: Sept. 6, 2011.
Reargument Denied Sept. 27, 2011.

Herbert W. Mondros, Esquire, of Margolis Edelstein, Wilmington, Delaware; and Michael Wiseman, Esquire (argued) and Elizabeth Larin, Esquire, of the Federal Community Defender for the Eastern District of Pennsylvania, Philadelphia, Pennsylvania, for Appellant.

John Williams, Esquire (argued), of the Department of Justice, Dover, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

## I. Introduction

A jury found that the Movant–Below/Appellant, Ralph Swan, and a co-defendant, Adam Norcross, crashed through the patio doors of the home of the Warren family in Kenton, Delaware in 1996, and shot twenty-seven-year-old Kenneth Warren to death in front of his twenty-four-

year-old wife, Tina, and their nineteen-month-old son, Dustin. For that crime, the jury recommended to the trial judge, by a seven to five vote, that Swan should receive the death penalty. The trial judge agreed with that recommendation and imposed the death sentence. This Court affirmed Swan's convictions and death sentence on direct appeal.

Thereafter, Swan moved for postconviction relief and a new trial. The postconviction judge (who also was the trial judge) denied those motions after considering voluminous documentary evidence and several days of testimony. On appeal from that postconviction judgment, Swan raises six arguments. First, Swan contends that the trial judge erred in admitting the out-of-court statements of his co-defendant. Second, Swan contends that defense counsel was ineffective in failing to investigate the DNA issues in this case until mid-trial and, even then, by investigating the issue in an inadequate manner. Third, Swan contends that certain evidence, that was either unavailable or ineffectively not presented to the jury, demonstrates that Swan is innocent or, alternatively, that a new trial is required in the interest of justice. Fourth, Swan contends that defense counsel was ineffective in failing to rehabilitate prospective jurors or to object to the trial judge's dismissal of them. Fifth, Swan contends that his death sentence is unconstitutional because it was not unanimously recommended by the jury, and because the trial judge and jury did not find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. And, sixth, Swan contends that defense counsel was ineffective in failing to conduct an adequate mitigation investigation and to present that miti-

gation evidence to the trial judge and jury. We find no merit to Swan's appeal and affirm the postconviction judge's denial of Swan's motions for postconviction relief and a new trial.

## II. Factual Background [1]

Shortly after 8 p.m. on November 4, 1996, the Warren family was settling in for the night in their Kenton, Delaware home. Kenneth Warren was sitting at the kitchen bar eating a sandwich while his wife, Tina, and their son, Dustin, were sitting on the family room couch watching television. Kenneth's mother, Lillian, had just left, after babysitting Dustin while Tina attended an aerobics class. Suddenly, two armed, masked men dressed in camouflage burst through the glass patio doors leading to the family room. They immediately ran into Kenneth and a struggle ensued. The intruders shot Kenneth four times, killing him, while his wife and son watched in horror. The intruders grabbed Tina's purse from the kitchen counter and fled. During the commission of this crime, Tina Warren observed that both assailants carried handguns, one of which appeared to be bronze or copper colored. One assailant appeared to have been shot in the left shoulder.

Ballistics evidence indicated that Kenneth Warren had been shot four times with two different types of handguns, a semi-automatic and a revolver. Kenneth was shot twice in the back, once on the left side of his head behind the left ear, and once through the top of his head. The fourth bullet, fired from a gun barrel held tightly against the top of his head, had traveled through the skull down into the back of his neck, killing him instantly. Examination of the three bullets removed

---

1. This factual background is taken from this Court's Opinion that affirmed Swan's convictions and death sentence on direct appeal.

*See Swan v. State,* 820 A.2d 342, 347–49 (Del. 2003).

from the victim's body revealed that the two back wounds had been made by .357 caliber copper/nickel jacketed bullets. Those bullets were manufactured by the Winchester Western Corporation under the "Silver Tip" trademark and had been fired from a revolver, manufactured by either Smith & Wesson, Ruger, or Taurus. But, a 10 mm/.40 Smith & Wesson caliber triple copper jacketed bullet, fired from a 10 mm semi-automatic gun made by Smith & Wesson or Irwindale, is what caused the fatal wound.

Tina's credit cards and checkbook were found in late November 1996 behind the rear fence of the Eastern Shore Concrete Company in Middletown, Delaware. The police searched the area and discovered her pocketbook fifteen feet away from the fence and her telephone calling card just inside the fence. But, the discovery of the purse and its contents at the concrete plant did not lead to any suspects.

Swan and Norcross both worked at the Eastern Shore Concrete Company at the time of the murder. On October 20, 1996, about a month before the murder, Norcross' former roommate reported the theft of two handguns from his residence: a .357 caliber Smith & Wesson revolver and a .40 caliber black Smith & Wesson semi-automatic handgun. Around the same time, during the fall of 1996, another employee of the concrete plant named Matthew Howell took work breaks with Swan and Norcross. Howell later testified that a few weeks before the murder, Norcross asked Howell whether he wanted to join Norcross and Swan in a robbery. Howell declined.

About a week later, Norcross told Howell that he drove a red sports car to a person's house located on a dark road and fired a shot at a glass patio door around the back of the house. He stated that he wore camouflage clothing and a mask that covered everything but his eyes. When he entered the house, a man came up to him and fell to his knees, grabbing hold of Norcross. Norcross put the gun to the side of man's head and pulled the trigger and the man "fell like a bag of potatoes." Norcross told Howell that Swan was hit in the shoulder either by the homeowner or in a crossfire. Norcross also told Howell that he had earlier robbed an armory in Middletown and stole fatigues and ration packs. He also told Howell that he grabbed a pocketbook from this house and threw it in the woods behind the concrete plant. Norcross then, in the presence of Howell, disposed of what appeared to be a checkbook by dropping it into a concrete product that was being poured. Finally, Norcross told Howell that he threw the guns into the Chesapeake and Delaware Canal and burned the clothing in a barrel. Norcross told all this to Howell because he claimed not to trust Swan and wanted someone to know what happened. Howell did not report this information to the police because Norcross threatened to kill him if he did.

Norcross told Howell this information one day after the incident occurred. Within a day or so after this conversation, Howell observed that Swan had injured his left shoulder and wore a bloodstained bandage. In December of 1996, Howell, Swan, and Norcross were laid off from the concrete plant.

During his employment at the concrete plant, Norcross dated Gina Ruberto. She observed Norcross with a black handgun that had to be clicked back to operate. Ruberto also testified to observing a big green duffel bag in Norcross' bedroom. Ruberto testified that one night Norcross was upset and showed her a newspaper article about a murder and robbery. Norcross started crying and told her about breaking into the back of a home occupied

by a man and his wife while wearing camouflage clothing. Norcross stated that he took a pocketbook and disposed of it behind a fence at the concrete plant. Norcross also stated that he threw the weapon in the water and burned the clothing in the green duffel bag. Two weeks later, Ruberto saw Swan's left arm in a sling. A few months later, she saw Swan without a shirt and noticed a purplish bruise or scar on his shoulder. She asked Swan about the scar. Swan stated he hurt his shoulder while boxing.

In 1997, Norcross worked as a farmhand near Chesapeake City, Maryland. He married Bridget Phillips in April, and in June or July of that year, Norcross invited Swan to work at the farm. Swan moved into the same house with the couple, and one day Phillips overheard a loud conversation between the two men. They were laughing about an incident where Swan had been shot. Norcross then explained to his wife that he and Swan had planned to "rob" an empty home, but found it occupied. He told her that the victim fired a shot and died because he "tried to play hero." Later, Phillips saw Swan without his shirt and observed a scar on his left shoulder. Norcross pointed to the scar and said that scar resulted from a gunshot. Swan responded by sticking his finger in the scar and saying: "Yes, and the bullet is still in there." Norcross also told Phillips that they would never be caught because they had worn masks.

Norcross and Phillips separated in December 1997. Two years later she contacted the Delaware State Police. The police arrested Norcross on February 9, 2000, and he gave a statement the following day. Norcross admitted that he was present during the incident, but in this version of the story, said that Swan killed Warren. Norcross claimed that Swan started shooting, but that Norcross' gun would not fire. Swan allegedly grabbed Norcross' gun, cleared it, and then used it to shoot Warren in the head. After the two men started running to Swan's car, Swan told Norcross that he wanted to go back and kill the woman because she was a witness. Norcross stopped Swan by shooting him in the shoulder. The two men, who both worked at the Eastern Shore Concrete Company in Middletown, disposed of Tina's purse and their weapons the next day.

### III. Procedural History

#### A. Indictment and Pretrial Hearings

Swan was arrested on February 25, 2000 and subsequently charged by indictment with three counts of murder first degree (one count of intentional murder and two counts of felony murder), robbery first degree, burglary first degree, conspiracy second degree, and five counts of possession of a firearm during the commission of a felony. On a morning scheduled for preliminary hearings, Swan and Norcross were in separate holding cells in the Kent County Courthouse when correctional officers intercepted a note that Swan had dictated to another inmate. In the note, Swan warned Norcross not to trust or talk to his attorney and gave his grandmother's telephone number as a means of communicating with him. Swan further warned Norcross: "Don't say anything or if you did, say you lied." Swan also told another inmate that he had nothing to worry about as long as Norcross refused to further cooperate with the State. This case proceeded to trial in June of 2001.

The trial judge conducted individual voir dire of prospective jurors for Swan's trial. Because Swan was potentially eligible for the death penalty, the trial judge asked each prospective juror, among other things, whether he or she could impose the death penalty. The trial judge typically

asked each prospective juror the following two questions: (1) "Have you formed or expressed an opinion about whether or not the defendant should be given the death penalty?", and (2) "Are there any circumstances under which you could consider imposing the death penalty?"[2] The trial judge excused eight prospective jurors on the basis of their answers to those questions. Six of those eight prospective jurors answered the trial judge's second question in the negative, unequivocally stating that they could not impose the death penalty under any circumstances.[3] Two prospective jurors testified with less certainty. Prospective juror 7 stated that he had "some qualms about the death penalty." Prospective juror 7 also stated that he was "not sure" if he could recommend a sentence of death even if the evidence weighed in favor of it. Prospective juror 8 stated: "Up until this point, I was fairly ambivalent about the death penalty because I was not personally involved. Now I'm not really sure how I feel about it." Prospective juror 8 also stated that she was not sure if she could recommend a sentence of death even if evidence weighed in favor of it. Based on that testimony, the trial judge excused prospective jurors 7 and 8. Defense counsel did not attempt to rehabilitate those jurors or object to their dismissal.

## B. Trial: Guilt Phase

The central question in the guilt phase of Swan's trial was whether Swan was the assailant that accompanied Norcross in burglarizing the Warren home and murdering Kenneth Warren. During the opening statements, defense counsel previewed Swan's alibi defense and also told the jury the following:

> With respect to additional physical evidence, ladies and gentlemen, I'd like to bring to your attention and you will hear evidence that, in fact, there was clothing collected at the scene. It was Mr. Warren's clothing. When the police were doing their investigation, they collected the curtains and they collected clothing and they examined whatever they could for bullets, ballistics, and blood.
>
> Mr. Warren's clothing was collected and it was detected that there was additional blood, different material, different blood, on his clothing, not Mr. Warren's, not attributable to him, nor to his wife, nor to his child.
>
> That clothing was further investigated. It was sent to a lab and there was a DNA analysis done on the sample.
>
> Somewhat at the same time or at least in conjunction with when Mr. Swan and Mr. Norcross were arrested, blood samples were taken from the individuals. That blood was analyzed and it was compared to the substance that was found on Mr. Warren's pants. The DNA analysis excluded Swan and Norcross as being the contributors of any of that blood or DNA evidence.
>
> So, we know that there is someone, there is a third party somewhere, not Swan, wasn't Norcross, wasn't Mr. Warren's, something contributed blood and

---

2. In some instances, the trial judge also asked the prospective juror whether he or she had any religious, conscientious, or other opposition to the death penalty.

3. Juror 1 stated: "I don't believe in the death penalty." Juror 2 stated: "I have no problem with finding him guilty and the fact that giving him life imprisonment, but for death, I do not agree." Juror 3 stated that she opposed the death penalty. Juror 4 stated that she did not "believe in" the death penalty. Juror 5 stated: "I cannot vote for the death penalty." Juror 6 stated that she did not "believe in" the death penalty, explaining: "I don't think anyone's life should be taken, even though they might have taken somebody else's...."

DNA evidence to these pants or Mr. Warren's pants, excuse me, but it wasn't Mr. Swan.

After opening statements, the State presented its case. The State called several witnesses to prove that Swan had committed the crime with Norcross. Among other things, the State presented evidence to show that Swan, like one of the assailants, had suffered a shoulder wound around the time of the murder. The State also called Lillian Warren, who testified that upon leaving Kenneth's house on the night of the murder, she observed a small, red car parked nearby. The State presented evidence to show that Swan had owned a red car that matched that description around the time of the murder. The State was unable to call Norcross as a witness because he invoked his Fifth Amendment right not to incriminate himself. But, the State was able to admit portions of Norcross's out-of-court statements with various references to Swan and plural usage that could unfairly implicate Swan redacted.[4] The State also introduced evidence of Swan's post-arrest warning to Norcross not to talk and his boast that he had nothing to worry about as long as Norcross kept his mouth shut.

Swan presented an alibi defense. Swan was a martial arts boxer and attempted to show that he had sparred with a professional boxer named Michael Stewart from October 1996 through November or early December 1996. He also presented evidence that the scar on his shoulder could not have resulted from a gunshot wound and that he showed no signs of injury when he participated in a February 8, 1997 kickboxing tournament. Defense counsel did not present the DNA evidence mentioned in opening statements.

During the closing statements, defense counsel reminded the jury that the State did not present any DNA evidence that linked Swan to the crime. But, the State pointed out that defense counsel did not present any exculpatory DNA evidence either, stating: "[W]hat did [defense counsel] say to you? 'The defense will show you DNA evidence which specifically excludes Swan.' Did we hear anything about that? No. It's a non-issue, ladies and gentlemen. It is simply a non-issue." Following closing statements, the jury deliberated for four days and returned a guilty verdict on all counts. The case then proceeded to the penalty phase.

## C. Trial: Penalty Phase
### 1. Opening Statements

The State and the defense both gave opening statements in the penalty phase of Swan's trial. The State advised the jury that it would present evidence of aggravating circumstances in three basic forms: (1) the horrific nature of the murder, (2) the impact of Kenneth Warren's death of his family, friends, and the community, and (3) the criminal record, character, and propensities of Swan.

The defense began its opening statement by stating: "Our hope is that you will see the true picture of what Randy Swan's life has been and the impact he's had on others, not just snapshots taken in 1991 and 1996." The defense continued: "What you're going to see is a picture of a young man who was born without many of the advantages that many of us have known." The defense then advised the jury that it would present evidence of mitigating circumstances as follows: (1) "the fact that Randy was raised in an abusive home without a role model and was abandoned as a teenager," (2) "the fact that he

---

4. *See Swan,* 820 A.2d at 352–54.

does not have a lengthy criminal history of convictions for offense involving the use of violence," (3) "the fact that he would not be a danger to others if imprisoned at maximum security for the rest of his life," (4) "the fact that he could have a positive impact on the lives of others if incarcerated and allowed to live," and (5) "most importantly, we will ask you to consider the mitigating circumstances of the devastating impact that it would have on Randy's family if he were put to death."

### 2. State's Case

On the first day of the penalty hearing, the State called the following nine witnesses: (1) Keith Marvel, (2) Orlan T. Kelly, Jr., (3) Henry Miller, (4) Allen J. Cook, III, (5) Bethany Zeleski, (6) Deborah Crothers, (7) Cheryl Vest, (8) Lillian Warren, and (9) Tina Leager. On the second day of the penalty hearing, the State called the following four witnesses: (1) Thomas E. Wey, (2) Joseph B. Danna, (3) Robert S. Yung, and (4) Charles R. Cash. We summarize each witness's testimony below.

#### a. Delaware State Police Detective Keith Marvel

Delaware State Police Detective Keith Marvel, along with other officers, executed the search warrant of Swan's residence at the time of his arrest. Detective Marvel testified that he discovered a black briefcase during that search, and that he found several items in that briefcase, including two black face masks, twenty .32 caliber bullets, a Charter Arms .32 caliber revolver, and a newspaper cutout about homicides in Wilmington, Delaware. He also testified that he found a photograph of a red Dodge Daytona in a backpack.

#### b. Orlan T. Kelly, Jr.

Kelly was a long-time friend of the Warren family. Kelly had known Kenneth Warren's parents in high school and stayed in contact with the Warren family over the years. When Kenneth Warren wanted to build a house for speculation, Kelly loaned him money to do so. Kelly testified that Kenneth Warren repaid the loan in full on the day of settlement, and that he and Kenneth later entered into another business transaction that "turned out just perfect." Kelly also testified about Kenneth Warren's character: "He was a very upstanding boy. Throughout his life and since I knew him, he was honest, sincere, never did anything that I know. I never seen him smoke, drink, cuss or anything. He was a wonderful person." Kelly testified about the impact of Kenneth's death as follows: "I was devastated. I couldn't believe it. I mean, it was something that just doesn't happen or is not supposed to happen for a fellow like that."

#### c. Henry Miller

Miller was a longtime friend of Kenneth Warren. The pair had known each other for nineteen years, starting when the two had worked together on the farm of Kenneth's grandfather. Miller had prepared an "open letter to the community concerning the untimely death of Kenneth Warren," which Miller read to the jury. In part, Miller's letter read: "I knew Kenny as an almost member of my family and found him trustworthy and deserving of my respect, trust and admiration. He was always honorable and candid in his personal and business dealings. . . . Kenny was, indeed, a person of fine character with a true sense of values."

#### d. Allen J. Cook, III

Cook was Kenneth Warren's cousin. Cook explained that the entire family lived within a five to seven mile radius of their grandfather's farm. Cook described Ken-

neth as "a friend, a cousin, somebody you'd want to have a good friendship with." Cook, a Delaware State Police Officer, testified that he was working on the night of Kenneth's murder and that he heard the call over the dispatch radio. Cook immediately drove to his cousin's house, "shaking the whole way there." Cook recalled that when he arrived, "the only thing [he] could do ... was run to Tina and Dustin." Cook struggled to explain the impact of Kenneth's death: "The only—I just have to look at my aunt and uncle. When I look at them and then when I look at my grandfather's eyes and the pain it's caused us—I mean, it's very hard to explain the impact."

### e. Bethany Zeleski

Zeleski testified that she knew Swan and his co-defendant, Adam Norcross. The three had worked on a farm together during the end of 1997 and in early 1998. Zeleski testified that she was afraid of firearms at that time, and that to overcome her fear, Swan agreed to show her how to shoot a gun so long as she obtained the ammunition. Zeleski ultimately did that, and she and Swan practiced firing a revolver. On cross-examination, Zeleski testified that Swan had told her that he wanted to learn sign language and become a teacher for the deaf.

### f. Deborah Crothers

Crothers was Kenneth Warren's younger sister. Crothers testified that Kenneth Warren "was my security. He was a very, very protective older brother. He was an absolutely wonderful person who had become my friend, and I was very, very proud to say, 'He's my brother.'" Crothers also testified about how she felt when she learned of Kenneth's death: "The most horrendous night anybody could ever imagine." Crothers continued: "My life hasn't been the same. I lost my innocence that night." Crothers also testified that she named her daughter, Kennedy, in honor of her brother, Kenny.

### g. Cheryl Vest

Vest was Kenneth Warren's older sister. Vest explained that after Kenneth's death, she had "a very hard time trusting people," and there was "a big emptiness." Vest continued: "Every time you look at my parents, there's that hollowness, the emptiness.... No matter what we do, we can't have a complete holiday because Kenny's not there."

### h. Lillian Warren

Lillian was Kenneth Warren's mother. Lillian explained that Kenneth was close to his parents, sisters, and brother. Lillian described Kenneth as "a good person," who "appreciated everything that [people] did for him, but he didn't want anything given to him." Lillian testified that Kenneth's goal in life was to have a family and a dairy farm, and that Kenneth thought his son, Dustin, was "the most precious gift in life." Lillian also explained how Kenneth's death had impacted her: "Immeasurable pain, emptiness, numbness. Nothing ever will be the same. You can't explain it. The impact that this has had on our family will go forever and ever." Lillian also explained that she had observed the physical and emotional decline of her father (Kenneth's grandfather) after Kenneth's murder.

### i. Tina Leager

Tina was Kenneth Warren's wife. She testified about Kenneth's character, his goals, their marriage, and his relationship with their son. Tina explained that she did not have a good answer for her son's question: "Why is my daddy dead?" Tina recalled all of the fear and agony she had suffered since Kenneth's death, and de-

scribed her "biggest flashback" from the night of the murder as follows: "When I went around the counter to—to see if—if Kenny was all right and I shook him and he still had part of his sandwich in his mouth, and I thought he didn't even have a chance.... And I never got to say good-bye."

### j. Thomas E. Wey

Wey was a teacher from Houston, Texas. Wey testified about an encounter with Swan approximately six years before the murder, at the school where Wey taught. Swan was not a student at the school, but he was in the building with three other persons. Wey observed that one of them, later identified as Swan, had a razor blade in his back pocket. Wey instructed the three to leave, and they complied. Wey called the police and reported the incident, informing the authorities of the make and model of the car in which they left.

### k. Joseph B. Danna

Danna was a Memorial Villages Police Department Officer in Houston, Texas who responded to Wey's call. Danna stopped the vehicle and found a butterfly knife under Swan's seat. He testified that Swan was charged with, and pled guilty to, possession of a prohibited weapon on school grounds. Danna interviewed Swan and recalled that Swan was "uncooperative, aloof, [and] had a little bit of a smart-aleck attitude."

### l. Robert S. Yung

Yung was a computer engineer, who worked at Agama Systems in Houston, Texas. Yung testified about the armed robbery of Agama Systems that occurred approximately five years before the murder. Swan participated in that robbery. Yung recalled that computer equipment valued at over $100,000 had been stolen that day.

### m. Charles S. Cash

Cash was a Houston Police Department Officer who specialized in the investigation of Asian gangs and organized crime. He investigated and later arrested Swan for the Agama Systems robbery. When Cash entered Swan's apartment to make that arrest, he found Swan with a .9 millimeter on a nearby table, a .9 millimeter between his legs, and a shotgun nearby. He also found a .38 Derringer in a nearby bathroom, as well as several boxes of ammunition. Cash testified that Swan pled guilty to aggravated robbery.

### 3. Defense Case

The defense called the following seven witnesses in the penalty phase of Swan's trial: (1) Rodney Feazell, (2) Alvin Hudson, (3) Ralph Tucker, (4) Susan Tucker, (5) Karen Faye Eaton, (6) Jennifer Fenimore, and (7) Catherine Tucker. Each witness's testimony is summarized below.

### a. Rodney Feazell

Feazell was a Probation and Parole Officer for the Delaware Department of Corrections. Feazell supervised Swan in 1996 after Swan was transferred from Texas. Feazell testified that Swan had "no disciplinary or adjustment problems" under his supervision. But, on cross-examination, the State showed that Swan had violated the conditions of his supervision with impunity on several occasions.

### b. Alvin Hudson

Hudson was a Corrections Officer at the Sussex Correctional Institution in Georgetown, Delaware. Hudson worked in the maximum security housing unit where Swan resided, and testified that he had supervised Swan for the past year. Hudson described Swan as follows: "[S]ince he's been there, he's pretty much been to

hi[m]self, doesn't really socialize with a lot of people. He's quiet. Never hear nothing from him." Hudson testified that Swan was employed as a tier janitor. Hudson explained that prisoners could only obtain that job if they did not require supervision and that Swan "always" fit that description.

### c. Ralph Tucker

Swan's father, Ralph Tucker, testified that he and Swan's mother, Patricia Swan, were approximately seventeen years old when she gave birth to Swan. They were not married. Tucker testified that Swan lived with his maternal grandmother and Patricia during his early years and that he spent every other weekend with Swan. Tucker described Patricia Swan as "a little wild." Tucker recalled that Patricia Swan would "leave [Swan] in the car a lot and unattended, going in other people's houses and stuff with her friends and partying." Tucker also recalled that Ralph Swan told him that one of his mother's boyfriends abused Swan: the man "[l]ocked [Swan] in closets and stuff like that there while they partied with the rest of their friends."

Tucker testified that Patricia Swan "disappeared" with Ralph Swan when Ralph was approximately eleven or twelve years old. Tucker had no contact with Swan for the next thirteen years, until he made arrangements for Swan to return to his home in Delaware.

Tucker testified that he and his wife, Cathy, as well as their sons, Joshua and Corey, would continue to visit and communicate with Swan if he received a life sentence. But, if Swan was executed, the impact on the family would be "devastating."

### d. Susan Tucker

Swan's aunt (Ralph Tucker's sister), Susan Tucker, testified that if Swan was permitted to live, he could "absolutely" have a positive impact on his family. Susan Tucker also testified that if Swan was executed, it would put her in "grave danger," as she suffered from multiple sclerosis. Susan Tucker testified that the family would experience that "void again," as they had when Swan disappeared with his mother.

### e. Karen Faye Eaton

Swan's other aunt (also Ralph Tucker's sister), Karen Faye Eaton, also testified. Eaton vaguely recalled how Swan's mother treated him: "His mother had some issues. She was—she took him places where we didn't know where he was. We weren't always sure where he would be."

Eaton testified that she visited Swan and communicated with Swan by letter. Eaton testified: "He's my Bible study partner. He's my coach, my counselor. He . . . helps me build my faith. He keeps me strong." Eaton also testified that Swan had told her that he started a Bible study group in prison. Eaton testified that she could not imagine the impact that Swan's execution would have on her and Swan's family.

### f. Jennifer Fenimore

Swan's cousin, Jennifer Fenimore, testified that she corresponded with Swan by letter. Fenimore also testified that she believed that Swan would have a positive impact on her and Swan's family if he was not executed. Fenimore stated: "I would like to see him live."

### g. Catherine Tucker

Swan's stepmother (Ralph Tucker's wife), Catherine Tucker, also testified. Catherine Tucker testified that she knew Swan for one year before he disappeared with his mother. Catherine Tucker recalled that Swan was "very sweet" and

"never wanted to go home when he was with us" and that Swan lived in her house when he moved back to Delaware after his prison term in Texas.

Catherine Tucker also testified that since Swan was incarcerated for Warren's murder she and her husband visited Swan "just about every weekend" and also communicated with Swan by phone and letter. Catherine Tucker also described a change in Swan that she noticed since his imprisonment: "He's very spiritual. He's helped many people [in prison]. He has his own congregation there now." Catherine Tucker testified that her family would be devastated if Swan was executed and that Swan's grandmother "can't even talk about it without breaking down." Catherine Tucker also read a letter that Swan had sent her for Mother's Day:

> Hey. Thought you might like something for Mother's Day. God has opened my eyes to many things through all of this. One of them is that you visit me in prison. You're kind. You're understanding. You're supportive. You give me good advice. You stood firm by my side when I gave up and pushed you away. What I'm trying to say [is that] in my eyes and in my heart, you are my mom. I see a little of God's plan for removing the one that I had from my life. God has changed my life and by doing that he has changed your life and everyone around me too. I hope that one day you will love Him and take Him as serious as I do. God bless. Happy Mother's Day, Mom.

### 4. Jury Instructions, Closing Statements, and Jury Recommendation

The trial judge then instructed the jury on the law that applied in the penalty phase of Swan's trial. Thereafter, the State gave its closing statement. The State asked the jury to consider the following circumstances as aggravating: (1) the impact of Warren's murder on his family and friends, (2) Warren was defenseless, (3) the murder was committed without provocation, (4) Warren was murdered in front of his wife and son, (5) the murder was vicious, brutal, and random, (6) Swan had a prior violent criminal history, (7) Swan did not show any remorse, and (8) Swan posed a danger to society. The defense then gave its closing statement, focusing on residual doubt and explaining that Swan did not show remorse because he did not commit the crime. The defense also discussed Swan's childhood: Swan "was raised in an abusive home, no positive role model, and he was abandoned as a teenager.... We could never imagine being locked in [a] closet while your mother or your father were outside drinking and partying...." The defense also stated that Swan had proven to be a model prisoner. The State then presented a rebuttal closing statement, and the jury was dismissed to deliberate. Approximately three hours later, the jury returned, recommending by a vote of seven to five to impose the death penalty.

### 5. Sentencing Opinion [5]

In his sentencing opinion, the trial judge first explained that the Delaware capital punishment statute provided that Swan would be eligible for capital punishment if at least one of twenty-two statutory aggravating circumstances was established beyond a reasonable doubt.[6] The trial judge found that one of those statutory aggravating circumstances was present in Swan's case—that the murder was committed

---

**5.** *See State v. Swan,* 2001 WL 1223198 (Del.Super. Oct. 3, 2001).

**6.** 11 *Del. C.* § 4209(e).

while Swan was engaged in the commission of a robbery or burglary.[7]

The trial judge then stated that he would impose the death sentence if he found by a preponderance of the evidence, after weighing all of the relevant evidence in aggravation or mitigation, that the aggravating circumstances outweighed the mitigating circumstances.[8] The trial judge explained that under Delaware law the jury's role was only to submit a recommendation, but that the statute required the judge to consider the jury's recommendations in arriving at the sentencing decision.[9] The trial judge stated that the jury's sentencing recommendations were an important factor in his final decision.

The trial judge then recounted the relevant facts, emphasizing the brutal and senseless nature of Kenneth Warren's murder: "The home is a place of safety and security. It is a place where ordinary people should be able to enjoy ordinary things without fear of harm from intruders." The trial judge concluded that "[t]he deadly intrusion of Norcross and Swan into the home and family of Kenneth Warren [wa]s an aggravating factor of the first magnitude.... This already weighty factor becomes heavier still when one understands that this is not a case where burglars unexpectedly found someone at home. The defendants wore masks and carried pistols in obvious anticipation of encountering persons." The trial judge did not view the crime as a mere "robbery gone bad," but rather as a "ruthless act of human predation."

The trial judge then focused on the testimony of Kenneth Warren's family, friends, and associates, and concluded that "[t]he impact of Kenneth Warren's death on those around him [wa]s an aggravating circumstance, particularly since the defendants knew they were destroying a family when they murdered him."

The trial judge found that Kenneth Warren was a well-respected member of his community, and that Kenneth Warren had "great promise," given his young age and impeccable reputation. The trial judge concluded that "Kenneth Warren's high regard in the community [wa]s also an aggravating factor."

The trial judge next focused on Swan's criminal history, recounting the facts of the crimes for which Swan was convicted in Texas. Finding that Swan's resulting prison term in Texas did not teach him a lesson, the trial judge concluded that Swan's Texas crimes and the close proximity in time of the Warren murder to Swan's release from prison were aggravating factors.

---

7. 11 *Del. C.* § 4209(e)(1)j. The trial judge also found that title 11, section 4209(e)(2) established Swan's eligibility for capital punishment. Section 4209(e)(2) provides: "In any case where the defendant has been convicted of murder in the first degree in violation of any provision of § 636(a)(2)-(6) of this title, that conviction shall establish the existence of a statutory aggravating circumstance...."

8. 11 *Del. C.* § 4209(d)(1).

9. At the time of Swan's sentencing, title 11, section 4209(d)(1) relevantly provided (emphasis added):

A sentence of death shall be imposed, *after considering the recommendation of the jury*, if a jury is impaneled, if the Court finds:
a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.

The trial judge also emphasized the significance of the items found during the search of his apartment after Warren's murder: a briefcase containing a mask, a .32–caliber revolver and ammunition. The presence of those items, the trial judge found, suggested that Swan was contemplating further criminal activity, which, the trial judge concluded, constituted an aggravating circumstance.

The trial judge next explained that Swan had made no statements to the police and did not exercise his right to allocution at his penalty hearing. The trial judge found no direct evidence of remorse. The trial judge noted the testimony of Swan's co-defendant's wife, who had overheard Norcross and Swan reminiscing in a light hearted fashion about the murder with no expression of regret. The trial judge found that that lack of remorse was an aggravating factor. In sum, the trial judge found one statutory aggravating factor and identified seven non-statutory aggravating factors.

The trial judge then considered the mitigating circumstances presented. The trial judge recognized that Swan was born out of wedlock, but noted that his father did not abandon him. The trial judge also recounted that although Swan was in his mother's custody, his father provided support and exercised his right to visitation. The trial judge found that Swan had a good family on his father's side.

The trial judge determined that evidence of Swan's childhood was scant because his mother disappeared with him when he was eleven years old. Because of that time gap, the next information about Swan related to his arrest in Texas when he was twenty years old. The trial judge concluded that "[b]ecause of this limited information, [he] [could] not conclude that Swan's upbringing was so bad as to constitute a mitigating circumstance."

Focusing on Swan's relationship with his family, the trial judge next found that Swan's father, aunts and cousins were good, decent people who were deeply affected by his circumstances. The trial judge found that Swan had maintained contact with his family and that his relationship with them was one of mutual affection. The trial judge concluded that that was "the good side of Ralph Swan" and was a mitigating circumstance. The trial judge also found that Swan was a model prisoner both in Texas and Delaware, and concluded that Swan's ability to function well in prison and even contribute to prison welfare was a mitigating circumstance.

The trial judge summarized his findings as follows: "The circumstances of the crime and the criminality of [Swan] are aggravating circumstances of overwhelming weight. They are not counterbalanced ... by the relationship Swan has with his father's family and his ability to function well in prison." Based on that analysis, the trial judge imposed the death sentence.

### D. Direct Appeal

On direct appeal to this Court, Swan raised several arguments, including that the trial judge erred in allowing the State to introduce various out-of-court statements made by Norcross, and that the Delaware death penalty statute is unconstitutional. This Court did not find merit to any of Swan's arguments on direct appeal and affirmed Swan's convictions and death sentence.[10] After this Court affirmed the convictions and death sentence, the United States Supreme Court denied

---

10. *Swan v. State,* 820 A.2d 342 (Del.2003).

Swan's petition for writ of *certiorari.*[11]

### E. Postconviction Proceedings

Swan moved for a new trial and for postconviction relief in the Superior Court. After an evidentiary hearing, the postconviction judge denied the new trial motion. Swan appealed, and this Court remanded the case for the postconviction judge to include consideration of the new trial issues along with issues raised in the postconviction motion.[12] The postconviction judge then held additional hearings over five days. We summarize the evidence that was presented in connection with Swan's new trial and postconviction motions.

#### 1. Evidence related to the guilt phase

The postconviction proceedings revealed that defense counsel had intended to call Regina Pineda, the DNA analyst who had authored the report that analyzed the blood samples taken from the Warren home and Kenneth's pants. Defense counsel did not speak with Pineda until after the defense's opening statement. Then, during the trial, the prosecutor told defense counsel that Pineda had told him that the report was "erroneous" and that he could no longer exclude Swan as a contributor. Defense counsel contacted Pineda, who explained that she could not exclude Swan as a contributor so long as one assumed that there was a third contributor to the sample. Based on that conversation, defense counsel decided not to call Pineda as a witness.

At the postconviction proceedings, two witnesses testified about the DNA evidence. First, Pineda testified that her reports were not erroneous. Then, Pineda explained that she could not exclude Swan if there was a third contributor, but that the possibility of a third contributor was not scientifically supportable. Pineda further explained that even if there was a third contributor, no conclusion—exculpatory or inculpatory—could be drawn. Dr. Richard Shaler—a forensic science specialist—also testified for Swan. Shaler agreed with Pineda that there was no scientific evidence to support the conclusion that there was a third contributor to the sample.

Swan also introduced his Texas prison records from four years before the crime. Those records were not introduced at trial, even though they revealed that Swan had a preexisting left shoulder deformity that "suggest[ed] previous trauma or surgical removal." At the postconviction hearing, defense counsel acknowledged that "any information that would have indicated to us what caused Mr. Swan's scar on his shoulder would have been helpful."

Adam Norcross also testified at the postconviction proceedings. Norcross claimed that he had committed the crimes with the help of a friend named "Wayne" and that Swan was not involved. Norcross stated that he used Swan's car on the evening of the murder, dropping him off at his kick boxing gym before leaving for Clayton, Delaware. Norcross testified that Wayne was injured during the crimes but was afraid to go to the hospital. Norcross recalled that Wayne appeared to be dying so Norcross pulled the car to the

---

**11.** *Swan v. Delaware,* 540 U.S. 896, 124 S.Ct. 252, 157 L.Ed.2d 174 (2003). On that date—October 6, 2003—Swan's conviction and death sentence became final for purposes of Superior Court Criminal Rule 61. Super. Crim. R. 61(m) ("A judgment of conviction is final for the purpose of this rule ... (3) ...

when the United States Supreme Court issues a mandate or order finally disposing of the case on direct review.").

**12.** *Swan v. State,* 925 A.2d 505, 2007 WL 1138474 (Del.2007) (TABLE).

side of the road and shot and killed Wayne to stop his pain. Norcross denied ever having attributed the crime to Swan and stated that Matthew Howell and Bridget Phillips either lied or combined Norcross's statements with newspaper stories to supply their testimony at trial. Norcross testified that he feared that Swan would turn him in for the crime. The postconviction judge found that Norcross's testimony was not credible and that it would not have been believed by the jury or raised a reasonable doubt as to Swan's guilt.[13]

### 2. Evidence related to the penalty phase

The postconviction proceedings revealed that several witnesses could have provided testimony to strengthen Swan's mitigation case. The State rebutted some of that evidence. Documentation also was introduced at the postconviction proceedings. We now summarize that evidence.

#### a. Charles E. Griffin, Jr.

Griffin is Swan's maternal half brother; that is, Patricia Swan was both Swan's and Griffin's mother. Griffin, who is six years younger than Swan and had not seen Swan in approximately twenty years, testified that defense counsel did not contact him at the time of Swan's trial. Griffin testified about the conditions under which he and Swan grew up. Specifically, Griffin and Swan were subjected to "relentless mental, verbal, and physical abuse," they were "locked up in rooms … like caged animals," and the only consistent part of their lives was "merciless beatings." Griffin also testified that Swan, as Griffin's older brother, tried to protect Griffin from the beatings. Griffin recalled that Swan was once punished for that effort by being hit in the head with a cast iron skillet. Griffin recalled that Swan "was asleep for a long time" after that blow to the head. Griffin

and Swan were subjected to sexual abuse as well, and Griffin's mother and her friends often abused drugs and alcohol in front of Griffin and Swan.

#### b. Freda Lynn Griffin–Surratte

Griffin–Surratte is Swan's step-aunt. Her brother is Chuckie Griffin, the father of Charles E. Griffin, Jr. Griffin–Surratte described her brother—Swan's stepfather—as follows: "He's violent. He[ ] does drugs even to this day. He drinks. He loves to beat women. He's a mean, mean, nasty person." Griffin–Surratte testified that Chuckie Griffin was a member of a local motorcycle gang.

Griffin–Surratte described Patricia Swan—Swan's mother—as follows: "She's mean. Mean, nasty, always liked to fight. Was not a good mother at all." According to Griffin–Surratte, Patricia Swan was a drug user and hung around members of local motorcycle gangs.

Griffin–Surratte recalled that she would often visit the apartment shared by Chuckie Griffin, Patricia Swan, Ralph Swan, and later Charles Griffin, Jr. The apartment was often the venue for "wild drug parties." At those parties, Griffin–Surratte explained, there was "drugs being done, a lot of fighting, a lot of hitting, a lot of yelling." Swan witnessed these activities. Griffin–Surratte also described instances when Patricia Swan physically abused Swan, recalling that she always observed bruises or cuts on Swan's head or body.

#### c. William J. Weaver, Jr.

Reverend Weaver was the senior pastor of the Crossroads Presbyterian Church in Middletown, Delaware and Swan's friend when the two were in the second and third grade. Weaver testified that during their friendship he observed bruises on Swan's

---

**13.** *State v. Swan*, 2010 WL 1493122, at *5 (Del.Super. Apr. 8, 2010).

body, bruises Weaver described as "very significant." Weaver recalled that Swan would show them and tell him that he received them from Patricia Swan.

#### d. Ralph E. Tucker

Swan's father, Tucker, who had testified at the penalty phase of Swan's trial, provided additional testimony at the postconviction proceedings. Tucker testified that he had seen Patricia Swan under the influence of drugs and alcohol while she was pregnant with Swan, and that Patricia Swan associated with members of a local motorcycle gang, including Griffin, while she was raising Swan. When Swan was still a young boy, Tucker observed Patricia Swan physically abuse Swan and that he also observed bruises on Swan's body. Swan told Tucker that Griffin physically abused him too and that Patricia Swan had once hit Swan in the head with a frying pan. Tucker testified that he did not provide this information to the jury at the trial because he was never asked about it.

#### e. Carol Armstrong, Ph.D.

Armstrong is a board certified neuropsychologist, who administered a full battery of neuropsychological tests to measure Swan's brain function. Armstrong concluded from those tests that Swan exhibited a diffuse pattern of brain injury, consistent with fetal alcohol exposure, childhood abuse and neglect, and head injuries. Armstrong testified that those neuropsychological deficits impaired Swan's functioning in numerous ways and that those deficits intensify when Swan is under physiological or psychological stress. Swan's deficits, Armstrong testified, were present in 1996. Armstrong also administered other tests, from which she concluded that Swan was not attempting to exaggerate his symptoms.

#### f. Richard G. Dudley, Jr., M.D.

Dudley is a board certified psychiatrist, who conducted a forensic evaluation of Swan that included clinical interviews with Swan and several of his family members. Dudley believed that Swan provided reliable information in the interviews, and concluded that Swan's childhood history was "among the worst and most clinically significant physical and psychological abuse he has encountered." Based on his observations, Dudley opined that Swan was "tortured instead of nurtured" during his childhood. Dudley diagnosed Swan with post-traumatic stress disorder, chronic depression, and cognitive disorder NOS, and explained that those disorders impaired Swan's judgment and decision-making.

#### g. Steven Samuel, Ph.D.

The State presented Steven Samuel to rebut Armstrong's and Dudley's conclusions. Samuel, a licensed psychologist in the state of Pennsylvania, interviewed Swan twice and administered a number of tests. Samuel concluded that Swan's scoring profile was consistent with "malingering," that is, that Swan "tried to look very, very disturbed on the test[s]." Samuel opined that he could not agree with Armstrong's and Dudley's conclusions because Swan demonstrated "malingering," and had been in prison a long period of time before the tests were administered. Samuel also concluded that he could not definitively opine about Swan's condition at the time of the murder: "[Swan's] records are replete with information about his personality, his character, his legal history and so on, but there's nothing to support the conclusion that he had a psychiatric or a cognitive disorder at [the] time [of the murder]." As for the alleged neuropsychological deficits, Samuel opined: "I don't believe those deficits would have interfered with his behavior on that day."

### h. Documents

Swan presented documents showing that he lived in an unstable home during his youth. For example, Swan attended three different kindergartens and eleven different schools in eleven years. After missing numerous days of school in the first and second grade, Swan was required to repeat the second grade. The documents also demonstrated a pattern of inconsistent achievement. Texas Department of Corrections records from 1993 revealed that Swan "seem[ed] to be [at a] [h]igh [r]isk for suicidal ideation." Those records also revealed that Swan had his skull x-rayed after being struck in the back of the head with a tire tool.

### F. Denial of Motions and Opinion on Remand

The postconviction judge denied Swan's motions for postconviction relief and a new trial.[14] Swan appealed, and after oral argument, we concluded that a remand was required. We directed the postconviction judge to analyze Swan's claim that his counsel was ineffective in failing to conduct an adequate mitigation investigation in light of the United States Supreme Court's recent decisions in *Williams v. Taylor*,[15] *Wiggins v. Smith*,[16] *Rompilla v. Beard*,[17] *Porter v. McCollum*,[18] and *Sears v. Up-*ton,[19] and the United States Court of Appeals for the Third Circuit's recent decisions in *Jermyn v. Horn*[20] and *Outten v. Kearney*.[21] We also directed the postconviction judge to specifically address whether Swan had demonstrated that defense counsel's failure to investigate and present certain mitigating evidence resulted in prejudice under *Strickland v. Washington*.[22]

Thereafter, the postconviction judge issued an Opinion on Remand,[23] in which the postconviction judge first addressed and distinguished the cases cited in the remand order.[24] The postconviction judge concluded that Swan had not shown that defense counsel's performance was deficient. Second, the postconviction judge concluded that Swan had not shown prejudice, because there was not "a substantial likelihood that the vote would have favored life imprisonment if the jury had been presented with the post-conviction evidence."[25] The postconviction judge recognized that he, as the trial judge, made the final determination and, "[h]aving heard all of the evidence during the guilt and penalty phases of the trial and all of the postconviction evidence ... the new evidence would not have altered [the court's] conclusion that the aggravating circumstances outweighed the mitigating circumstances

---

**14.** *State v. Swan,* 2010 WL 1493122 (Del.Super. Apr. 8, 2010).

**15.** 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**16.** 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**17.** 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

**18.** —— U.S. ——, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

**19.** —— U.S. ——, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010).

**20.** 266 F.3d 257 (3d Cir.2001).

**21.** 464 F.3d 401 (3d Cir.2006).

**22.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**23.** *Swan v. State,* 2011 WL 976788 (Del.Super. Mar. 16, 2011).

**24.** *Id.* at *2–3.

**25.** *Id.* at *4.

and justified the imposition of the death penalty."[26]

## IV. Discussion

Swan raises six arguments on appeal. First, Swan contends that the trial court erred in admitting the out-of court statements of Norcross. Second, Swan contends that defense counsel was ineffective in failing to investigate the DNA issues until mid-trial and, even then, in investigating the issue in an inadequate manner. Third, Swan contends that evidence, that was either unavailable or ineffectively not presented to the jury, demonstrates that Swan is innocent or, alternatively, that a new trial is required in the interest of justice. Fourth, Swan contends that defense counsel was ineffective in failing to rehabilitate prospective jurors or to object to the trial judge's dismissal of them. Fifth, Swan contends that his death sentence is unconstitutional because it was not unanimously selected by the jury, and because the trial judge and jury did not find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. And, sixth, Swan argues that defense counsel was ineffective in failing to conduct an adequate mitigation investigation and present the resulting mitigation evidence to the trial judge and jury.

 We review the Superior Court's denial of postconviction relief for abuse of discretion.[27] Questions of law are reviewed *de novo*.[28] Claims of a constitutional violation also are reviewed *de novo*.[29] Because five of Swan's six claims are governed by Superior Court Criminal Rule 61 and the test articulated in *Strickland v. Washington*,[30] we overview that analytical framework at the outset. Rule 61(i) provides:

(1) Time limitation. A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.

(2) Repetitive Motion. Any ground for relief that was not asserted in a prior postconviction proceeding, as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim is warranted in the interest of justice.

(3) Procedural Default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

(A) Cause for relief from the procedural default and

(B) Prejudice from violation of the movant's rights.

(4) Former Adjudication. Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.

26. *Id.*

27. *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

28. *Id.*

29. *Id.*

30. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

(5) Bars Inapplicable. The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.

(6) Movant's Response. If ordered to do so, the movant shall explain on the form prescribed by the court why the motion for postconviction relief should not be dismissed or grounds alleged therein should not be barred.

Accordingly, to the extent that Swan now raises arguments that were presented or could have been presented in the proceedings leading to his convictions and death sentence, those claims are procedurally barred. Swan seeks to overcome the procedural bar in two ways. First, as to some of his claims, Swan argues that the procedural bar should not apply because the "interest of justice" requires reconsideration of those claims under Rule 61(i)(4). Second, as to other claims, Swan argues that defense counsel provided ineffective assistance. We analyze the second set of claims under the test articulated by the United States Supreme Court in *Strickland*.

■ *Strickland* requires Swan to make two showings. First, Swan must show that defense counsel's performance was deficient.[31] Second, Swan must show that his counsel's deficient performance prejudiced the defense.[32] In *Strickland*, the United States Supreme Court explained that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." [33]

■ Under *Strickland's* first prong, judicial scrutiny is "highly deferential." [34] "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." [35] Accordingly, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." [36] The *Strickland* court explained that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." [37] A movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." [38]

---

**31.** *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052 ("This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

**32.** *Id.* at 687, 104 S.Ct. 2052 ("This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.").

**33.** *Id.* at 697, 104 S.Ct. 2052 ("The object of an ineffectiveness claim is not to grade counsel's performance.").

**34.** *Id.* at 689, 104 S.Ct. 2052 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'") (citing *Michel v. Louisiana*, 350 U.S. 91, 100–101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

**35.** *Id.*

**36.** *Id.*

**37.** *Id.* at 690, 104 S.Ct. 2052.

**38.** *Id.*

■ Under *Strickland's* second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." [39] In other words, "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." [40] "Some errors will have had a pervasive effect . . ., and some will have had an isolated, trivial effect." [41] Accordingly, "[t]he [movant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [42] "Reasonable probability" for this purpose means "a probability sufficient to undermine confidence in the outcome." [43] In making this determination, the *Strickland* court explained that a court must consider the "totality of the evidence," [44] and "must ask if the [movant] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." [45] "[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." [46] With those principles in mind, we now address each of Swan's claims on appeal.

A. *Swan has not shown that the interest of justice requires reconsideration of his claim related to the admission of his co-defendant's out-of-court statements.*

■ Swan argues that the admission of out-of-court statements at Swan's trial made by his co-defendant, Norcross (who was "unavailable" after invoking his Fifth Amendment right not to incriminate himself), violated his constitutional rights. Those statements were admitted as evidence through the testimony of Matthew Howell, Gina Ruberto, and Bridget Phillips, and through Norcross's statement to the police following his arrest. Specifically, Swan argues that those statements violated his Sixth Amendment right to confront witnesses in the following respects: the admission of all the statements violated (1) the rule established in *Lilly v. Virginia,*[47] and (2) the rule established in *Crawford v. Washington.*[48] And, the admission of Norcross's statement made to Howell violated the rule established in *Bourjaily v. United States.*[49]

The postconviction judge concluded that these claims were procedurally barred.[50] We agree. This Court considered, and rejected, Swan's *Lilly* claim on direct appeal.[51] Although not expressly under *Bourjaily,* this Court also considered and

39. *Id.* at 693, 104 S.Ct. 2052.

40. *Id.*

41. *Id.* at 695–96, 104 S.Ct. 2052.

42. *Id.* at 694, 104 S.Ct. 2052.

43. *Id.*

44. *Id.* at 695, 104 S.Ct. 2052.

45. *Id.* at 696, 104 S.Ct. 2052.

46. *Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citing *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052).

47. 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

48. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

49. 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

50. *Swan,* 2010 WL 1493122, at *9.

51. *Swan v. State,* 820 A.2d at 352–54.

rejected Swan's claim that Norcross's statement to Howell was not admissible under Delaware Rule of Evidence 801(d)(2)(E).[52] Consequently, Rule 61(i)(4) bars those claims as were formerly adjudicated on direct appeal,[53] and Swan has not shown that "reconsideration of th[ose] claim[s] is warranted in the interest of justice." [54] Swan's claim under *Crawford* also is barred because the United States Supreme Court did not decide *Crawford* until March 8, 2004, after Swan's convictions and death sentence became final on October 6, 2003.[55] Because *Crawford* does not retroactively apply to Swan's case,[56] reconsideration of Swan's claim under that rule is not warranted in the interest of justice.[57]

*B. Swan has not shown that there is a reasonable probability that the result of the guilt phase of the proceeding would have been different if defense counsel had investigated and presented the DNA evidence.*

 Swan argues that defense counsel was ineffective in failing to investigate the DNA issues until mid-trial and even then in failing to adequately investigate those issues. Swan argues that he suffered prejudice because in the opening statement, defense counsel promised to present exculpatory DNA evidence but then failed to deliver on that promise. That prejudice was exacerbated, Swan argues, when the State capitalized on defense counsel's failure in its closing argument. Swan claims that the DNA evidence "would have provided powerful exculpatory evidence."

This is not a case where the exclusionary results of the DNA testing would have exonerated Swan. As the postconviction judge observed: "[T]he fact that Swan's DNA is absent from the samples does not prove that he was not one of the murderers. Nor does it mean that Swan's blood was not somewhere else in the Warren home or on Warren's body or clothes. It only means that Swan's blood or DNA was not on the samples tested by ReliaGene." [58]

Swan's contention that "[p]rejudice is further highlighted by the State's capitalization during closing argument on counsel's failure to present the DNA evidence" is overstated. During closing argument, the prosecutor told the jury the following: "[W]hat did [defense counsel] say to you? 'The defense will show you DNA evidence which specifically excludes Swan.' Did we

---

**52.** D.R.E. 801(d)(2)(E) ("A statement is not hearsay if … [t]he statement is offered against a party and is … a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court.").

**53.** Super. Ct.Crim. R. 61(i)(4); *Flamer v. State*, 585 A.2d 736, 745–46 (Del.1990) ("Neither federal nor state courts are required to relitigate in post conviction proceedings those claims which have been previously resolved.") (quoting *Younger v. State*, 580 A.2d 552, 556 (Del.1990)).

**54.** Super. Ct.Crim. R. 61(i)(4).

**55.** *See supra* note 11.

**56.** *See McGriff v. State*, 929 A.2d 784, 2007 WL 1454883, at *1 (Del.2007) (TABLE). *See also Whorton v. Bockting*, 549 U.S. 406, 417–21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) ("[W]e hold that *Crawford* announced a 'new rule' of criminal procedure and that this rule does not fall within the *Teague* exception for watershed rules."). Even if the rule in *Crawford* retroactively applied, it would not have operated to exclude the statements of Howell, Ruberto, and Phillips, because those statements were not "testimonial." *See Crawford*, 541 U.S. at 50–54, 124 S.Ct. 1354.

**57.** *See Flamer*, 585 A.2d at 745–46 ("Because the rule [ ] has no retroactive application …, we conclude that reconsideration of his claim is not warranted in the interest of justice.").

**58.** *Swan*, 2010 WL 1493122, at *3.

hear anything about that? No. It's a non-issue, ladies and gentlemen. It is simply a non-issue." Rather than attempting to "capitalize" on defense counsel's "broken promise," the record appears to reflect that the prosecutor simply was asking the jury to focus on the evidence that actually was presented. As recounted above, the evidence implicating Swan was significant. Among other things, the State showed that Swan suffered a shoulder wound at the relevant time and owned a car that matched the description of the car at the scene of the murder. Norcross's out-of-court statements, together with Swan's admissions and his post-arrest conduct, were further proof of Swan's guilt.

"When a [movant] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[59] Swan has not made that showing.

C. *Swan has not shown that there is a reasonable probability that the result of the guilt phase of the proceeding would have been different if all of the relevant evidence had been presented.*

Swan next claims that his execution would violate the United States and Delaware Constitutions because evidence, either unavailable or ineffectively not presented to the jury, demonstrates that he is actually innocent. Swan argues, in the alternative, that this evidence requires a new trial under Superior Court Criminal Rule 33 in the "interest of justice." Swan points specifically to three pieces of evidence: (1) the DNA evidence discussed above, (2) documentary evidence about Swan's preexisting shoulder deformity, and (3) Norcross's post-trial testimony.

Rule 61(a) identifies the scope of a postconviction proceeding. That rule "governs the procedure on an application by a person in custody or subject to future custody under a sentence of this court seeking to set aside a judgment of conviction or a sentence of death on the ground that the court lacked jurisdiction or on any other ground that is a sufficient factual and legal basis for a collateral attack upon a criminal conviction or a capital sentence." Assuming that an "actual innocence" claim is a ground that is a sufficient factual and legal basis for collateral attack,[60] the threshold showing for that claim "would necessarily be extraordinarily high."[61] Swan has failed to meet that burden.

As explained above, the DNA evidence does not exculpate Swan. That evidence

**59.** *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

**60.** The United States Supreme Court has explained that a showing of actual innocence likely is not an independent ground for collateral attack, but rather a basis to overcome a procedural bar. *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[O]ur habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").

**61.** *Herrera,* 506 U.S. at 417, 113 S.Ct. 853. *See also In re Davis,* — U.S. ——, 130 S.Ct.

1, 174 L.Ed.2d 614 (2009) ("The [trial] [c]ourt should receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial *clearly establishes* petitioner's innocence.") (emphasis added); *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ("[W]e think that in an extraordinary case, where a constitutional violation has *probably resulted* in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.") (emphasis added); *Kuhlmann v. Wilson,* 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ("[T]he prisoner must 'show a *fair probability* that, in light of all the evidence . . .

only excludes Swan as a contributor to the particular DNA sample which was tested. The evidence of a preexisting shoulder injury also is unavailing because it would have been rebutted by the numerous witnesses who testified that Swan had injured his shoulder around the time of the murder.

Nor does Norcross's recantation provide a basis for postconviction relief. Because Norcross testified at the postconviction proceedings, we give deference to the postconviction judge's evaluation of Norcross's credibility. The postconviction judge found that Norcross's new story was "not credible" and "would not have been believed by a jury or raised a reasonable doubt as to Swan's guilt." [62] As the postconviction judge stated:

> [T]here was no corroboration for any portion of the story and [ ] it was so vague as to be probably impossible to corroborate. There was nothing specific about Wayne, who he was, what he did, or who his friends were. . . . Norcross had no explanation for blaming Swan in his statements to family and friends and not Wayne, a drug buddy, as he called him.[63]

Taking together all that evidence, Swan has not "clearly established" his innocence, nor has he shown a "fair probability" that in light of all the evidence, the trier of the fact would have entertained a reasonable doubt of his guilt.[64]

Swan also must satisfy a difficult burden to obtain a new trial under Superior Court Criminal Rule 33.[65] That rule relevantly provides:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. . . .

To obtain a new trial under that rule, Swan must show: (1) that newly discovered evidence would have probably changed the result if presented to the jury, (2) that the evidence was discovered since trial, and could not have been discovered before trial with due diligence, and (3) that the evidence is not merely cumulative or impeaching.[66]

Swan's claim under Rule 33 fails for two reasons. First, Swan has neither claimed nor shown that the DNA evidence and the evidence of a preexisting shoulder injury could not have been discovered before trial with due diligence. To the contrary, he argues that defense counsel was ineffective

---

the trier of the facts would have entertained a reasonable doubt of his guilt.' ") (emphasis added) (quoting Henry J. Friendly, *Is Innocence Irrelevant?, Collateral Attack on Criminal Judgments*, 38 U. CHI. L.REV. 142, 160 (1970)).

62. *Swan*, 2010 WL 1493122, at *5.

63. *Id.* at *5.

64. *See Davis*, 130 S.Ct. at 1; *Carrier*, 477 U.S. at 496, 106 S.Ct. 2639; *Wilson*, 477 U.S. at 454 n. 17, 106 S.Ct. 2616.

65. We have addressed how Rules 33 and 61 relate as follows: "Even if Rule 33 applies in

a particular case, [ ] it does not control the question of whether a defendant also can move for a new trial under Rule 61 if the motion can properly be classified as seeking postconviction relief." *Weedon v. State*, 750 A.2d 521, 527 (Del.2000) (citing *Maxion v. State*, 686 A.2d 148, 150–51 (Del.1996)).

66. *Lloyd v. State*, 534 A.2d 1262, 1267 (Del. 1987) (quoting *State v. Lynch*, 128 A. 565, 568 (Del.Ct.O. & T.1925)). *See also Hicks v. State*, 593 A.2d 589, 1991 WL 78451, at *1 (Del. 1991) (TABLE).

for not discovering this evidence. Second, (and as discussed above), Swan has not shown that that evidence, and Norcross's recantation, would have probably changed the result of the proceeding if presented to the jury. Accordingly, Swan has not shown that the postconviction judge erred in denying his new trial motion.

*D. Swan has not shown that defense counsel's performance was deficient in failing to attempt to rehabilitate prospective jurors or object to their dismissal.*

 Swan argues that defense counsel was ineffective in failing to rehabilitate prospective jurors or to object to the trial judge's dismissal of those jurors. Swan focuses on the voir dire of eight jurors in particular. As recounted earlier, six of those prospective jurors unequivocally stated that they could not impose the death penalty under any circumstances, and two of those jurors testified with less certainty.

In *Witherspoon v. Illinois,* [67] the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." [68] The United States Supreme Court later clarified its holding in *Wainwright v. Witt,* [69] explaining that the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [70] By parity of reasoning, the Court in *Morgan v. Illinois* [71] held that a capital defendant may challenge for cause "[a] juror who will automatically vote for the death penalty in every case [because such a juror] will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." [72] The holdings of *Witherspoon, Witt,* and *Morgan* form the basis for the legal test that applies under the United States Constitution.

This Court has adopted those holdings as Delaware law.[73] We have recognized

---

**67.** 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**68.** *Id.* at 522, 88 S.Ct. 1770.

**69.** 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

**70.** *Id.* at 424, 105 S.Ct. 844. *See also Morgan v. Illinois,* 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("[I]t is clear from *Witt* and *Adams,* the progeny of *Witherspoon* that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."); *Lockhart v. McCree,* 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case."); *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) ("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.").

**71.** 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

**72.** *Id.* at 729, 112 S.Ct. 2222.

**73.** *See, e.g., Manley v. State,* 709 A.2d 643, 654 (Del.1998) ("The standard for excluding a juror for cause, as a result of the juror's views on capital punishment, is 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' ") (quoting *Witt,* 469 U.S. at 424, 105 S.Ct. 844).

that although jurors are "not the final arbiters of punishment, jurors still play a vital and important role in the sentencing procedure."[74] Under Delaware law, voir dire of prospective jurors is the primary method of assembling a jury which serves that vital role and complies with *Witherspoon*, *Witt*, and *Morgan*.[75] By that process the trial judge can elicit prospective jurors' bias or prejudice.[76] As this Court has explained, a trial judge has broad discretion in deciding whether prospective jurors should be excused for cause[77]: "The role of the trial judge, who observes a juror who may be 'wrestling with his conscience,' is paramount."[78]

Swan has not shown that defense counsel was ineffective by failing to rehabilitate, or to object to the trial judge's dismissal of, six prospective jurors who unequivocally stated that they could not impose the death penalty under any circumstances. Those six jurors were excludable under the standard articulated in *Witt*.[79]

▆▆ Swan also has not shown that defense counsel was ineffective in failing to rehabilitate, or to object to the trial judge's dismissal of, the two prospective jurors who explained that they were "not sure" if they could recommend a death sentence even if the evidence that was presented made that sentence appropriate. Swan has not overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance...."[80] The trial judge has broad discretion in deciding whether prospective jurors should be excused for cause.[81] The trial judge in this

74. *Gattis v. State*, 697 A.2d 1174, 1181 (Del. 1997).

75. *Manley*, 709 A.2d at 654 ("The goal [of voir dire] is to secure for the defendant and the State an impartial jury that will be able to decide the case on the basis of the evidence presented at trial and follow the court's instructions on the law.") (citing *DeShields v. State*, 534 A.2d 630, 634 (Del.1987)). The General Assembly also has addressed this subject. Title 11, section 3301 of the Delaware Code provides the guideposts for trial judges when examining potential jurors in capital cases. That section provides:

When a juror is called in a capital case, the juror shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if the juror has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If the answer is in the negative, the juror shall be sworn as a juror in the case, unless the juror has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant, or unless the juror shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If the juror's answer to the question be in the affirmative, the juror shall be disqualified to sit in the case, unless the juror shall say, upon oath or affirmation, to the satisfaction of the court, that the juror feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event the juror shall be a competent juror, if not otherwise disqualified, challenged or excused.

The record reflects that the trial judge conducted voir dire in accordance with section 3301.

76. *Manley*, 709 A.2d at 654 (Del.1998) (citing *DeShields*, 534 A.2d at 634).

77. *Id.* at 655.

78. *Id.*

79. *See Gattis*, 697 A.2d at 1182 ("Because we find that [the potential jurors] were not improperly struck, we find meritless [the] contention that [ ] counsel's assistance was ineffective for not objecting to the exclusion of these [ ] potential jurors.").

80. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

81. *Manley*, 709 A.2d at 655 (citing *DeShields*, 534 A.2d at 634).

case had the opportunity to observe the two prospective jurors as they "wrestl[ed] with [their] conscience," and who were "not sure" if they could recommend a death sentence.[82] The trial judge ultimately excused those two prospective jurors, presumably because their views would "prevent or substantially impair the performance" of their duties as jurors in accordance with their instructions and oath.[83] Because Swan has not shown that the trial judge abused his discretion in that respect, Swan also has not shown that defense counsel was ineffective in failing to rehabilitate, or to object to the trial judge's dismissal of, those two prospective jurors.[84]

### E. Delaware's sentencing procedure does not violate Ring.

Swan next argues that the United States Supreme Court's decision in Ring v. Arizona[85] requires reversal of his death sentence because the jury did not unanimously find that the aggravating circumstances outweighed the mitigating circumstances, and because neither the jury nor the trial judge found the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The Court in Ring overruled a previous decision, Walton v. Arizona,[86] to the extent that it allowed a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.[87]

We considered and rejected this claim on direct appeal.[88] Consequently, Rule 61(i)(4) bars this claim as formerly adjudicated on direct appeal.[89] Swan has not shown that "reconsideration of th[is] claim is warranted in the interest of justice."[90] But, even if reconsideration was required, this Court has previously addressed, and rejected, this argument in other cases. In Brice v. State,[91] we accepted and answered several certified questions of law from the Superior Court, including whether Ring "require[s] that a jury must find beyond a reasonable doubt that all aggravating factors found to exist outweigh all mitigating factors found to exist?"[92] We answered that question in the negative, explaining that the trigger that increases the maximum punishment is the finding of a statutory aggravator—by the jury—beyond a reasonable doubt.[93] Ring did not extend to the weighing phase, this Court also held, because the weighing phase does not increase the maximum punishment, but only ensures that the punishment is appropriate and proportional.[94] We again reaf-

---

82. Id.

83. See Witt, 469 U.S. at 424, 105 S.Ct. 844. The postconviction judge, who also was the trial judge, explained that "there was no basis for an objection from defense counsel." Swan, 2010 WL 1493122, at *9.

84. See Gattis, 697 A.2d at 1182.

85. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

86. 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

87. Ring, 536 U.S. at 609, 122 S.Ct. 2428.

88. Swan v. State, 820 A.2d at 359.

89. Super. Ct.Crim. R. 61(i)(4); Flamer, 585 A.2d at 745–46 ("Neither federal nor state courts are required to relitigate in post conviction proceedings those claims which have been previously resolved.") (quoting Younger, 580 A.2d at 556).

90. Super. Ct.Crim. R. 61(i)(4).

91. 815 A.2d 314 (Del.2003).

92. Id. at 318.

93. Id. at 322.

94. Id.

firm the holding of *Brice*.[95] Accordingly, even if Swan's claim were not procedurally barred (which it is), it lacks merit.

> *F. Swan has not shown that there is a reasonable probability that the result of the penalty phase of the proceeding would have been different if all of the relevant evidence had been presented and considered.*

Swan argues that he was denied his Sixth Amendment right to effective assistance of counsel because defense counsel failed to conduct an adequate mitigation investigation, and thus failed to develop and present significant mitigating evidence about Swan's traumatic life history, brain damage, and mental health deficits. Swan argues that the inability of the trial judge and jury to consider that significant mitigating evidence plainly establishes that defense counsel's ineffectiveness resulted in an unreliable death verdict. Swan also argues that the postconviction judge erroneously applied *Strickland's* prejudice prong. Specifically, Swan urges that the postconviction judge's prejudice analysis failed to evaluate the totality of the available mitigating evidence, and that "whether [the postconviction judge] himself would have been persuaded by the evidence is "irrelevant," because the 'assessment of prejudice . . . should not depend on the idiosyncrasies of the particular decisionmaker.' "

We review this constitutional claim *de novo* under the test articulated in *Strickland v. Washington.* The United States Supreme Court in *Strickland* stated that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." [96] So we begin our analysis with the prejudice prong. To reiterate, "[i]t is not enough for the [movant] to show that the errors had some conceivable effect on the outcome of the proceeding." [97] Rather, "[t]he [movant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [98] "When a [movant] challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [99] "Reasonable probability" equates to "a probability sufficient to undermine confidence in the outcome." [100] That showing requires Swan to establish " 'a reasonable probability that a compe-

---

95. *See Gattis v. State*, 955 A.2d 1276, 1288–90 (Del.2008); *Capano v. State*, 889 A.2d 968, 977 (Del.2006); *Starling v. State*, 882 A.2d 747, 756–57 (Del.2005); *Steckel v. State*, 882 A.2d 168, 172 n. 23 (Del.2005); *Ortiz v. State*, 869 A.2d 285, 303–05 (Del.2005); *Cabrera v. State*, 840 A.2d 1256, 1272–74 (Del.2004); *Taylor v. State*, 822 A.2d 1052, 1056–57 (Del. 2003). Two other states employ a similar penalty scheme, where the jury serves an advisory role but must find at least one statutory aggravating circumstance beyond a reasonable doubt before the death penalty may be imposed. *Ala.Code* §§ 13A–5–46 & 13A–5–47. *F.S.A.* § 921.141. Appellate courts in those states also have upheld that statutory scheme.

*See Ex parte Waldrop*, 859 So.2d 1181 (Ala. 2002); *Rivera v. State*, 859 So.2d 495 (Fla. 2003).

96. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("The object of an ineffectiveness claim is not to grade counsel's performance.").

97. *Id.* at 693, 104 S.Ct. 2052.

98. *Id.* at 694, 104 S.Ct. 2052.

99. *Id.* at 695 104 S.Ct. 2052.

100. *Id.* at 694, 104 S.Ct. 2052.

tent attorney, aware of the available mitigating evidence, would have introduced it at sentencing,' and 'that had the [sentencer] been confronted with this ... mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.' "[101] Our inquiry is therefore objective: what a reasonable sentencer in these circumstances would have done when confronted with the evidence.[102]

In making this determination, we must consider the "totality of the evidence."[103] A careful prejudice inquiry requires us to "consider *all* the relevant evidence that the [sentencer] would have had before [him] if counsel had pursued a different path."[104] That includes the evidence adduced at trial as well as that which was not presented until postconviction review.[105] We must reconstruct the record and assess it anew.[106] In doing so, we cannot merely consider the mitigation evidence that went unmentioned in the first instance. We must also take account of the anti-mitigation evidence that the State would have presented to rebut the movant's mitigation testimony.[107] That evidence, of course, includes the evidence that the State actually presented at trial, at the penalty hearing and in the postconviction proceedings.

Having thus reconstructed the record, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence."[108] Only then may we

---

**101.** *Wong v. Belmontes,* —— U.S. ——, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009) (quoting *Wiggins v. Smith,* 539 U.S. 510, 535, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).

**102.** The United States Supreme Court in *Strickland* explained that the prejudice inquiry is objective in the following respect:
> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

*Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Although we review the totality of the evidence objectively and *de novo,* that standard of review does not preclude us from giving deference to the postconviction judge's credibility assessments of witnesses in the postconviction proceedings.

**103.** *Id.* The inquiry "involves a 'qualitative' rather than a 'quantitative' consideration of the circumstances...." *Sullivan v. State,* 636 A.2d 931, 948 (Del.1994).

**104.** *Belmontes,* 130 S.Ct. at 386, 390 (2009) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.") (citing *Strickland,* 466 U.S. at 695–696, 700, 104 S.Ct. 2052).

**105.** *Porter v. McCollum,* —— U.S. ——, 130 S.Ct. 447, 453–54, 175 L.Ed.2d 398 (2009) ("[W]e consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding'—and 'reweigh it against the evidence in aggravation.' ") (quoting *Williams,* supra, at 397–398, 120 S.Ct. 1495). *See also Belmontes,* 130 S.Ct. at 386 ("[T]o establish prejudice, [the movant] must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence ... against the entire body of aggravating evidence").

**106.** *Williams v. Beard,* 637 F.3d 195, 227 (3d Cir.2011).

**107.** *Wong,* 130 S.Ct. at 390.

**108.** *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

determine whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. The *Strickland* test places the burden on Swan—not the State—to show a reasonable probability that the result of the penalty phase of the proceeding would have been different.[109]

■ Applying those principles to this case, we start by recounting the aggravating circumstances. The trial judge found that one statutory aggravating circumstance was established because the murder was committed while Swan was engaged in committing a robbery or burglary.[110] The trial judge then found seven non-statutory aggravating circumstances: (1) "[t]he deadly intrusion of Norcross and Swan into the home and family of Kenneth Warren," an "already weighty factor [which] bec[a]me[] heavier [because] this is not a case where burglars unexpectedly found someone at home," (2) "[t]he impact of Kenneth Warren's death on those around him ..., particularly since the defendants knew they were destroying a family when they murdered him," (3) "Kenneth Warren's high regard in the community," (4) Swan's Texas crimes, (5) the close proximity of the Warren murder to Swan's release from prison, (6) the presence of the items found in Swan's apartment at the time of his arrest, suggesting that Swan was contemplating further criminal activity, and (7) Swan's lack of remorse.[111] Having reviewed the record, we find that those aggravating circumstances were established and are of "overwhelming weight."[112]

Based on the evidence presented at the trial, the trial judge found only two mitigating circumstances: (1) "the good side of Ralph Swan"; namely, Swan's relationship with his family, and (2) Swan's ability to function well in prison.[113] Again having reviewed the record, we find that those mitigating circumstances were established. In the postconviction proceedings, Swan presented additional mitigating evidence in three basic forms: (1) life history, (2) brain injury, and (3) mental health deficits. What remains is to explore the significance of that newly presented mitigating evidence for purposes of Swan's *Strickland* claim.

No evidence of brain injury or mental health deficits was introduced in the penalty phase of Swan's trial. During the postconviction proceedings, Swan presented testimony and documentary evidence that tended to show that he suffered brain injury and experienced mental health deficits at the time of the murder. But, the State challenged that evidence, and we must take into account the evidence that the State presented to rebut Swan's mitigation evidence.[114] Dr. Samuel's testimony undercut the testimony of Swan's mental health experts. Other evidence also countered Swan's newly proffered mitigation evidence. The postconviction judge noted that evidence of Swan's intellectual deficit would have been countered by evidence that he held responsible jobs before and for at least three years after the murder.

---

**109.** *Belmontes*, 130 S.Ct. at 390–91 ("*Strickland* does not require the State to 'rule out' a sentence of life in prison to prevail.") (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

**110.** *Swan*, 2001 WL 1223198, at *1.

**111.** *Id.* at *3–4, 6.

**112.** *Id.* at *7 ("The circumstances of the crime and the criminality of the defendants are aggravating circumstances of overwhelming weight.").

**113.** *Id.* at *6–7.

**114.** *Belmontes*, 130 S.Ct. at 390.

That evidence would also have been countered by the evidence that Swan attempted to pass a note to Norcross after their arrest giving him legal advice; namely not to make any statements and to recant any he had made. Furthermore, there was evidence that regardless of his IQ, Swan was—as found by the trial judge—a "savvy person." Swan was able to function normally in society for the three years after the murder and before his arrest.[115] The evidence of brain injury and mental health deficits was, at best, contradictory and the postconviction judge appropriately viewed it with "extreme skepticism."[116] In short, that new mitigation evidence would not be given significant weight by a reasonable sentencer.

At the penalty phase of the trial, defense counsel also presented some evidence of Swan's life history. In the opening statement at the penalty phase, defense counsel stated that the evidence would show that Swan "was raised in an abusive home without a role model and was abandoned as a teenager." Swan's father, Ralph Tucker, provided that evidence, describing Patricia Swan as "a little wild" and recalling that she would "leave [Swan] in the car a lot

and unattended, going in other people's houses and stuff with her friends and partying."[117] Tucker also recalled that Ralph Swan told him that one of his mother's boyfriends abused Swan—"[l]ocked [Swan] in closets and stuff like that there while they partied with the rest of their friends." Defense counsel again emphasized the importance of that evidence in the closing statement: "[Swan] was raised in an abusive home, no positive role model, and he was abandoned as a teenager.... We could never imagine being locked in closet while your mother or your father were outside drinking and partying...." But, the evidence of Swan's childhood was limited at that time, and the trial judge said that he could not conclude that Swan's upbringing was "so bad as to constitute a mitigating circumstance."[118]

In the postconviction proceedings, Swan presented three witnesses to demonstrate that his upbringing was indeed "so bad." Swan's half brother (Charles E. Griffin, Jr.), step aunt (Freda Lynn Griffin–Surratte), and childhood friend (William J. Weaver) all provided testimony that not only corroborated Ralph Tucker's testimony at the trial, but also detailed the explicit

115. *Swan*, 2011 WL 976788, at *4.

116. *Swan*, 2010 WL 1493122, at *11. The postconviction judge found:

> Swan was tested and examined by a psychiatrist and a psychologist in 2006 almost 10 years after the murder. They concluded that he was borderline mentally retarded and suffered from post-traumatic stress disorder at the time of the murder. The Court views this testimony with extreme skepticism on several levels. First, it clashes with the Court's observation of defendant during trial and several pre-trial hearings. Second, the testing occurred approximately ten years after the crime and after Swan had been found guilty of murder, sentenced to death and spent six years in maximum security. The Court is not satisfied that the same results would have been obtained if the testing had been conducted pre-trial.

> Third, and perhaps most important, defendant was co-operative with these experts, and their opinions were heavily dependent on information supplied by Swan. Given his lack of co-operation with the trial counsel the Court finds that it would be unlikely that he would have been forthcoming to these experts or any others retained by trial counsel.
> *Id.*

117. During the penalty phase, Swan's aunt, Karen Faye Eaton, also hinted at problems in Swan's childhood: "His mother had some issues. She was—she took him places where we didn't know where he was. We weren't always sure where he would be."

118. *Swan*, 2001 WL 1223198, at *7.

nature of the abuse that Swan endured. The evidence presented in the postconviction proceeding regarding Swan's upbringing was "merely cumulative of the humanizing evidence" that was presented at the trial.[119] But, because the relevant evidence presented at the trial was the relatively vague testimony of one witness, the evidence in the postconviction proceedings developed and bolstered Swan's claim. Accordingly, the evidence presented in the postconviction proceedings established for the first time that Swan's upbringing was a mitigating circumstance.

With this reconstructed record in mind, we now "reweigh the evidence in aggravation against the totality of available mitigating evidence"[120] and ask whether Swan has shown a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different.[121] The postconviction judge did not find a substantial likelihood that the jury's vote would have favored life imprisonment had the jury been presented the postconviction evidence. The postconviction judge also determined that the new evidence would not have altered the ultimate result.

After making an independent and *de novo* review of the entire reconstituted record, we conclude that Swan has not carried his burden of showing a reasonable probability that he would have received a different sentence based upon the reconstructed record. The weight of the aggravating circumstances overwhelms the mitigating circumstances which have been presented in this case. Because Swan has not shown prejudice, his claim under *Strickland* fails. We therefore need not address whether defense counsel's performance at the penalty phase was deficient.

## V. Conclusion

Swan is not entitled to postconviction relief or a new trial. Swan's first claim is procedurally barred. Swan's second claim fails because he has not shown prejudice. Swan's third claim fails for the same reason. Swan's fourth claim fails because he has not shown that defense counsel's performance was deficient. Swan's fifth claim is procedurally barred, and Swan's sixth claim fails because he has not shown prejudice. Accordingly, the judgment of the Superior Court denying Swan's motions for postconviction relief and a new trial is **AFFIRMED.**

---

119. *Belmontes,* 130 S.Ct. at 387.

120. *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527.

121. *Belmontes,* 130 S.Ct. at 390–91.