# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. ID. No.  9808000280A |
| | ) | |
| | ) | |
| DAMONE E. FLOWERS, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: January 14, 2015
Decided: April 23, 2015

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT

## DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF
## SHOULD BE GRANTED.

Andrew J. Vella, Esquire, Deputy Attorney General, 820 N. French Street, 7th Floor, Department of Justice, Wilmington, Delaware, Attorney for the State.

Michael W. Modica, Esquire, 715 N. King Street, Suite 300. P.O. Box 437, Wilmington, Delaware, 19899, Attorney for Defendant Damone E. Flowers.

**MANNING**, Commissioner

This 23rd day of April, 2015, upon consideration of defendant Damone E. Flowers' Motion for Postconviction Relief, it appears to the Court that:

## I. FACTS

The facts giving rise to Flowers' convictions, as set forth by the Delaware Supreme Court in its opinion on Flowers' direct appeal, are as follows:

> On August 1, 1998 Alfred Smiley drove a car with two passengers in the area of 22nd and Lamotte Streets in Wilmington. At some point, Smiley became involved in an argument with several people on the street. A gunshot fired from the sidewalk next to the car struck Smiley in the chest. The car careened out of control on the street and came to rest against a utility pole. Wilmington Police responded to the call and took Smiley to the hospital where he died from the gunshot wound.
>
> The State charged Damone Flowers with Smiley's murder and presented five witnesses at trial who were alleged to have been present at the scene of the shooting. Most of the incriminating evidence was presented through pretrial taped statements [pursuant to 11 *Del. Code* § 3507]. [1]  Flowers presented no witnesses and did not testify. A jury convicted Flowers of First Degree Murder and Possession of a Firearm During the Commission of a Felony. The trial judge denied Flowers' motion for a new trial. [2]

## II. PROCEDURAL HISTORY

On October 30, 2003, Flowers was convicted of Murder in the First Degree and Possession of a Firearm During the Commission of a Felony, and subsequently sentenced to life in prison, plus ten years.  Flowers, with the assistance of counsel, took a direct appeal to the Delaware Supreme Court.  The Delaware Supreme Court affirmed the

---

[1] 11 *Del. Code* § 3507:
> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.
> (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.
> (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

[2] *Flowers*, 858 A.2d at 330.

convictions on August 31, 2004.[3] On May 3, 2005, Flowers filed a *pro se* Motion for Postconviction Relief under Superior Court Criminal Rule 61. Flowers' motion encompassed eleven separate grounds for relief and was supported by a handwritten 133 page memorandum of law. The Superior Court denied this motion on December 13, 2005. Flowers then appealed to the Delaware Supreme Court, however, that appeal was dismissed as untimely on April 4, 2006. Finding no relief in state court, Flowers pursued his postconviction claims in federal court. Flowers' federal claims were denied on September 22, 2008.[4]

On May 14, 2012, Flowers filed a second *pro se* Motion for Postconviction Relief pursuant to Rule 61 in the Superior Court ("Rule 61 Motion").[5] On April 25, 2013, with the assistance of counsel ("Rule 61 Counsel"), Flowers filed an Amended and Superseding Rule 61 Motion for Post Conviction relief that is the subject of this Report. Flowers' counsel in the 2003 trial ("Trial Counsel") filed an Affidavit in response to Flowers' claims on November 14, 2013. The State filed its Response on March 18, 2013. At the Court's request, Supplemental briefing was filed by Rule 61 Counsel on December 18, 2014. The State and Trial Counsel, at their election, did not file any subsequent responses.

### III. FLOWERS' RULE 61 CLAIMS

In Flowers' Amended and Superseding Rule 61 Motion, Flowers raises five claims of ineffective assistance of counsel at the trial and appellate level. Flowers' claims can be summarized as follows:

---

[3] *Flowers v. State*, 858 A.2d 328 (Del. 2004).
[4] *Flowers v. Phelps*, 2008 WL 4377704 (D. Del. Sep. 22, 2008).
[5] Due to the retirement of the Honorable Michael P. Reynolds, Flowers' Rule 61 Motion was reassigned to the undersigned Commissioner in November, 2014.

1.  Trial Counsel was ineffective by failing to object to the admission of the five section 3507 statements based on inadequate foundation; [6]

2.  Trial Counsel was ineffective by failing to object to the admission of the section 3507 statements as cumulative to the respective witnesses' live in-count testimony;

3.  Trial Counsel was ineffective by failing to object to allowing the jury to have copies of the section 3507 statements in the jury room during deliberations;

4.  Trial Counsel was ineffective by failing to investigate and/or present the exculpatory testimony of five different witnesses;

5.  Trial Counsel was ineffective by not raising claims of plain error on appeal to the erroneous admissions of the section 3507 statements during trial and as evidence given to the jury during its deliberations.

Because Flowers' filed his motion prior to the most recent amendment to Rule 61, his claims will be evaluated as Rule 61 existed on April 25, 2013. [7]

## IV. LEGAL STANDARD

To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged *Strickland* test by showing that: (1) counsel performed at a level "below an objective standard of reasonableness" and, (2) that the deficient performance

---

[6] To put Flowers' claims into context, a general overview of § 3507 is helpful at this point. 11 *Del. C.* § 3057 allows a party (typically the State, but the law is party neutral) to use a prior out–of–court statement (typically recorded) of a witness other than the defendant, as affirmative evidence in its case. To introduce a prior statement under the statute, the proponent must call the witness to the stand, must elicit testimony from the witness about the event perceived (typically the crime itself) that is the subject of the prior statement, and must ask the witness if he or she was telling the truth about what was observed when the prior statement was made. The witness is not required to offer live in-court testimony consistent with the prior statement, or to agree that the told was told about the prior event. If the proponent is unable to elicit the desired substantive testimony from the witness, and after the above foundation has been established, the witness is excused from the witness stand and the proponent will call a second witness (typically a police officer) to introduce the prior recorded statement. At that point, while the original witness remains in the courtroom, the prior statement is played (or read) for the jury. The prior statement must be near-verbatim, and not a summary based on the second witness' recollection. After the prior out of court statement is played for the jury, the original witness is recalled to the stand. The proponent may ask the witness additional questions, but is not required to do so. At that point, opposing counsel is entitled to cross-examination of the witness on both the live in-court testimony, and the prior out of court statement. *See Washington v. State*, WL 961561, at \*3 (Del. March 12, 2013).

[7] The current Rule 61 was amended effective June 4, 2014.

3

prejudiced the defense.[8] The first prong requires a defendant to show by a preponderance of the evidence that trial counsel was not reasonably competent, while the second prong requires a defendant to show that there is a reasonable probability that, but for trial counsel's unprofessional errors, the outcome of the proceedings would have been different.[9]

When a court examines a claim of ineffective assistance of counsel, it may address either prong first; where one prong is not met, the claim may be rejected without contemplating the other prong.[10]

Mere allegations of ineffectiveness will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[11] An error by trial counsel, even if professionally unreasonable, does not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[12]

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[13] Moreover, there is a strong presumption that trial counsel's conduct constituted sound trial strategy.[14]

In considering post-trial attacks on trial counsel, *Strickland* cautions that trial counsel's performance should be reviewed from trial counsel's perspective at the time decisions were being made.[15] It is all too easy for a court, examining counsel's defense

---

[8] *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).
[9] *Id.*
[10] *Id.* at 697.
[11] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[12] *Strickland*, 466 U.S. at 691.
[13] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. Oct. 31, 2008).
[14] *Strickland*, 466 U.S. at 689.
[15] *Id.*

after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[16] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[17]

The Supreme Court of the United States recognized that there are countless ways to provide effective assistance in any given case. Additionally, the Court cautioned that reviewing courts must be mindful of the fact that unlike a later reviewing court, trial counsel observed the relevant proceedings, knew of materials outside the record, and interacted with his client, with opposing counsel and with the judge.[18]

Even the best criminal defense attorneys would not defend a particular client in the same way. Consequently, trial counsel must be given wide latitude in making tactical decisions.[19] Counsel's representation must be judged by the most deferential of standards and there is a strong presumption that trial counsel's conduct constituted sound trial strategy.[20]

## V. PROCEDURAL BARS

Superior Court Criminal Rule 61 governs motions for postconviction relief.[21] Before addressing the substantive merits of any claim for postconviction relief, the Court must consider the procedural requirements of Rule 61.[22] Rule 61(i) establishes four procedural bars to a motion for postconviction relief.[23]

---

[16] *Id.*
[17] *Id.*
[18] *Harrington v. Richter*, 562 U.S. 86, 105 (2011).
[19] *Id.*
[20] *Strickland*, 466 U.S. at 689; *Harrington*, 562 U.S. at 107.
[21] Super. Ct. Crim. R. 61.
[22] *Younger v.* State, 580 A.2d at 554.
[23] Super. Ct. Crim. R. 61(i)(1)–(4).

Rule 61(i)(1) provides that a motion for postconviction relief must be filed within one year of a final judgment of conviction.[24] Under Rule 61(i)(2) any ground not asserted in a prior postconviction proceeding is barred "unless consideration of the claim is warranted in the interests of justice."[25] Rule 61(i)(3) bars consideration of any claim not asserted at trial or on direct appeal unless the movant can show "cause for relief from the procedural default" and "prejudice from violation of the movant's rights."[26] Rule 61(i)(4) provides that any ground for relief that was formerly adjudicated is thereafter barred.[27]

Even if a procedural defect exists, the Court may consider the merits of the claim if the Defendant can show that an exception found in Rule 61(i)(5) applies.[28] Rule 61(i)(5) provides that a defect under Rule 61(i)(1)–(4) will not bar a "colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[29]

At the outset, the Court notes that this is Flowers' second Rule 61 Motion. As such, the motion is repetitive under Rule 61(i)(2) and falls outside the time limits for filings set by Rule 61(i)(1).[30] Flowers seeks to overcome these procedural bars to relief by utilizing Rule 61(i)(2), for claims made in the "interest of justice" that were not raised in prior proceedings, and Rule 61(i)(5), for claims based on a "colorable claim that there was a miscarriage of justice."

---

[24] Super. Ct. Crim. R. 61(i)(1).
[25] Super. Ct. Crim. R. 61(i)(2).
[26] Super. Ct. Crim. R. 61(i)(3).
[27] Super. Ct. Crim. R. 61(i)(4).
[28] Super. Ct. Crim. R. 61(i)(5).
[29] *Id.*
[30] Flowers' judgment of conviction became final on September 16, 2004.

A review of Flowers' five claims, shows that none were formerly adjudicated in prior proceedings either at the trial, appeal or post conviction level, making Rule 61(i)(4) inapplicable.[31]

Flowers argues that the procedural bar of Rule 61(i)(3) is inapplicable here because although his five claims were not asserted in any prior proceedings, he has shown cause for relief from the procedural default. Flowers' argues that the procedural default was created by Trial Counsel's ineffectiveness in not raising these claims during trial or on appeal. According to Flowers, the result of this ineffectiveness prejudiced him: namely that he was convicted at trial but should not have been and that his case should have been reversed on appeal, but was not.

In opposition, the State argues that all of Flowers' claims are time barred, and that the first claim is procedurally barred because it does not satisfy the requirements of Rule 61(i)(5) because Flowers has failed to prove the existence of a constitutional violation under the rule. The State relies on *State v. Taylor*, to support its argument. In *Taylor*, the Superior Court stated the following:

> [In] order to invoke Rule 61(i)(5) and by-pass Rule 61(i)(3)'s procedural bars, [a defendant] not only must raise a colorable claim that there was a miscarriage of justice, he also must show that the miscarriage of justice was caused by a constitutional violation. Further, he must demonstrate that the constitutional violation involved not only a mistake, but [] must [also] show that the mistake undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to his conviction. While the thresholds imposed by Rules 61(i)(3),(4) and (5) are not insurmountable, they are substantial and they are enforced.[32]

---

[31] In this case, the only similar issue previously adjudicated was the voluntariness of Rosetta Sudler's § 3507 statement. Trial Counsel objected during trial to the admission of Sudler's statement, but was overruled by the trial judge. Trial Counsel subsequently appealed the issue to the Delaware Supreme Court, albeit unsuccessfully. *See Flowers v. State*, 858 A.2d 328 (Del. 2004). The foundational element at issue in Flowers' present Rule 61 Motion, truthfulness, was not raised at trial or any subsequent state or federal proceeding.

[32] *State v. Taylor*, 2000 WL 33113935, at *2 (Del. Super. Oct. 27, 2000).

In the present case, the Court finds that Flowers' first claim is not barred by Rule 61 because a constitutional violation occurred when the § 3507 statements were admitted without the proper foundation. The Delaware Supreme Court has held that "[t]he Sixth Amendment requires an entirely proper foundation, if the prior statement of a witness is to be admitted under § 3507 as independent substantive evidence against an accused."[33] Additionally, in *Webster v. State*, [34] the Delaware Supreme Court held that "when a petitioner makes a colorable claim to a mistaken waiver of important constitutional right Rule 61(i)(5) is available to him."[35]

There is no evidence in the record that Flowers knowingly waived his Sixth Amendment right to counsel or to confront his accusers by waiving the § 3507 foundation requirements. As noted by this Court in *Taylor*, the burdens of Rule 61(i)(5), while high, are not insurmountable.

Because the constitutional nature of the claim is "manifest" and Flowers has presented a "colorable claim," it is appropriate for the Court to consider it under Rule 61(i)(5).[36] When a petitioner makes a "colorable claim," further inquiry is required.[37] Thus, as a threshold matter, the requirements of Rule 61(i)(5) have been satisfied and the procedural bars of Rule 61(i)(1), (2) or (3) are inapplicable.

The Court will now address the merits of each of Flowers' claims.

---

[33] *Blake v. State*, 3 A.3d 1077, 1083 (Del. 2010).

[34] *Webster v. State*, 604 A.2d 1364, 1366 (Del. 1992).

[35] While the *Webster* Court examined Rule 61(i)(5) in the context of an improper plea colloquy, the underlying claim, as in this case, involved a constitutional violation.

[36] *State v. Rosa*, 1992 WL 302295, at *3–4 (Del. Super. Sep. 29, 1992).

[37] *Webster*, 604 A.2d at 1367.

VI. DISCUSSION

First Claim

Flowers' alleges that Trial Counsel was ineffective for failing to object to the admission of the five out of court witness statements into evidence, pursuant to § 3507. Flowers argues the State failed to establish the proper legal foundation prior to admission of the § 3507 statements, because none of the witnesses were asked on direct examination if the statement given about the event was truthful, or not.

The Court's review of the record reveals that none of the five witnesses were asked, nor testified about, the truthfulness of their prior recorded § 3507 statements during direct examination. Thus, the question before the Court is twofold: (1) was the witness required to testify as to the truthfulness of the prior statement as a foundational condition to its admission under § 3507 in 2003, and (2) assuming the State had not established the proper foundation, was Trial Counsel's failure to object to the admission of the § 3507 statements objectively unreasonable and prejudicial?

### 1. Deficient performance analysis under *Strickland*.

Title 11 *Del. C.* § 3507 has received extensive scrutiny from the Delaware Supreme Court over the last 45 years. First enacted in enacted in 1970 as § 3509, it was changed to § 3507 with the 1974 Delaware Code revisions. The first examination of the statute by the Delaware Supreme Court was in *Keys v. State*, which established the general foundation requirements for admission of a statement pursuant to § 3507.[38] The foundational issue of "truthfulness" was not before the Court in *Keys*. However, in 1991, the Delaware Supreme Court in *Ray v. State*, held that a "witness' statement [under § 3507] may be introduced only if the two-part foundation is first established: the witness

---

[38] *Keys v. State*, 337 A.2d 18 (Del. 1975).

testifies about both the events and whether or not they are true." [39] Shortly thereafter, in the 1993 case *Feleke v. State*, the Delaware Supreme Court again had occasion to reiterate that the § 3507 foundation requires that "[f]irst, the witness must testify as to the truthfulness of the statement. Second, the witness must testify as to the events perceived or heard." [40]

In 2010, as part of a trilogy of consolidated cases addressing § 3507, the Delaware Supreme Court again squarely addressed the foundational requirements in *Blake v. State*, and held that:

> A two-part foundation must be established by the State during its direct examination before a witness' prior statement can be admitted under section 3507. First, the witness must testify about the events. Second, the witness must indicate whether or not the events are true. [41]

The *Blake* Court explained the "foundational requirements that the witness indicate whether or not the prior statement is true [or not] is one reason why the substantive operation of section 3507 does not violate the Sixth Amendment." [42] Consequently, a Sixth Amendment violation occurs if a § 3507 statements is played for the jury without the proper foundation. *Blake* makes clear that this holding is not new, and that in fact, the Court has been consistent in its foundation requirements for § 3507 since well before Flowers' 2003.

As Justice Holland explained in *Blake*:

> After *Ray* and *Moore* were decided, there was no reason for confusion, because our holding in *Moore* was completely consistent with *Ray*, where we construed *Johnson v. State* as standing for the proposition that the witness must testify about " *whether or not* " the prior statement is true. In *Johnson* we specifically recognized that the drafters of section 3507

---

[39] *Ray v. State*, 587 A.2d 439, 443 (Del. 1991).
[40] *Feleke v. State*, 620 A.2d 222, 226–7 (Del. 1993) (citing *Ray v. State*, 587 A.2d 439, 443 (Del. 1991).
[41] *Blake v. State*, 3 A.3d 1077, 1081 (Del. 2010).
[42] *Id.* at 1082.

"expressly contemplated that the in-court testimony [of a witness] might be inconsistent with the prior out-of-court statement. One of the problems to which [section 3507] is obviously directed is the turncoat witness . . . ." Accordingly, our 1995 decision in *Moore* clearly explained, "*[u]nder section 3507, there is no requirement that the witness either affirm the truthfulness of the out-of-court statement, or offer consistent trial testimony.*" Moreover, the foregoing sentence that is quoted from *Moore* is followed by "*See Ray v. State*, Del.Supr., 587 A.2d 439, 443 (1991) ("[A] witness statement may be introduced only if . . . the witness testifies about both the events and *whether or not they are true*.").[43]

In its Response Brief, the "State acknowledges that one of the necessary foundational questions was not asked at trial (i.e. whether the statement given by the witnesses [sic] to the police was true)."[44]   The State argues, however, that "at the time of Flowers' trial, the Delaware Supreme Court's view on this was that under § 3507, there is no requirement that the witness either affirm the truthfulness of the out-of-court statement or offer consistent trial testimony."[45]   The State cites to *Moore v. State*, to support this argument.[46]

The State's argument in response, while a correct statement of the law, is misplaced and confuses two distinct issues.  Flowers' is not arguing that the witnesses failed to "affirm" the truthfulness of their prior statements; rather, Flowers' is arguing that they were never asked by the State about truthfulness of the prior statements, *at all*.

Indeed*, Moore* does not stand for the proposition that the witness must agree or "affirm" that his or her prior statement about the events perceived was *actually true* as part of the § 3507 foundation.  Rather, the § 3507 foundation requires that the proponent of the witness must elicit testimony from the witness about the events observed and

---

[43] *Id.*
[44] State's Resp. Br. at 10.
[45] *Id*.
[46] *Moore v. State*, 1995 WL 67104 at *2 (Del. Feb. 17, 1995).

whether or not the prior statement made about it was true.[47] The actual answer from the witnesses (e.g. yes, no, I can't remember) is irrelevant and not a determinative factor in the basic foundational requirements. While this may seem peculiar, it makes sense viewed in the light of a "turncoat" witness who suddenly disavows a prior statement once on the stand in an attempt to help the defendant's case. For example, in *Washington v. State*, a witness, who was hostile to the State by the time of trial, was asked if he "told the truth" in a prior statement about a shooting, he answered "no." [48] After determining the statement was voluntarily made, the trial court allowed the prior statement into evidence under § 3507.[49] If a witness was *required* to "affirm" the truthfulness of the prior statement, as a condition of admission under § 3507, the purpose of the statute would be easily defeated.

The law in 2003 did not require a witness to "affirm" the truthfulness of the prior statement, nor does it today. More importantly, the law in 2003, as today, only requires the proponent to ask the witness about the truthfulness of the prior statement as part of the § 3507 foundation. [50]

Both the State and Trial Counsel reasonably should have been aware of the state of the law at the time of the trial.[51] The *Blake* opinion removes any doubt that the foundational requirements for admission of a statement under § 3507 were firmly

---

[47] *Feleke*, 620 A.2d at 226–227.
[48] *Washington v. State*, 2013 WL 961561, at *2 (Del. Mar. 12, 2013).
[49] *Id.*
[50] The State appears to overlook that it conceded such a fact when it argued *Blake*. "The State acknowledges that none of the five section 3507 witnesses was asked, on direct examination, whether or not the statement they made to police was truthful. The State also acknowledges that this Court, in *Ray v. State*, held that such a question was foundational." *See Blake*, 3 A.3d at 1081.
[51] *See also Woodlin v. State*, 3 A.3d 1084, 1087–88 (Del. 2010) (stating that as of the 1991 opinion in *Ray v. State*, "the declarant must also be subject to cross-examination on the content of the statement as well its truthfulness.").

established in 2003 and have not changed.[52]  Therefore, failure by the State to ask the witnesses about the truthfulness of their prior statements was error.  Likewise, failure of Trial Counsel to object to the introduction of the statement without the proper foundation was also error.

The State argues that Flowers' claim on this issue is "simply an allegation of error by the trial judge cloaked in an ineffective assistance of counsel claim . . . ."[53] While that may be true to an extent, Flowers' claim could have been presented as both plain error (as was the case in *Blake*), or an ineffective assistance of counsel claim, as it is here.  While the form of the claim in this case is different, the substance is the same as *Blake*.  No matter the procedural posture of the claim, the holding in *Blake* makes clear that an incomplete § 3507 foundation is a constitutional violation that *can* require reversal, depending on the remaining facts of the case.[54]

It is clear from the record that Trial Counsel could have, and should have, objected to the incomplete foundation prior to the admission of the five § 3507 statements in this case.  The State argues that had Trial Counsel objected, the State would have cured the error by simply asking the necessary question regarding truthfulness, and then introduced the § 3507 statements anyway.[55] A review of the trial transcripts shows that solution to be undoubtedly far easier said than done given the State's witnesses' combative attitudes and general lack of cooperation.  What could or might have happened at trial is not for the Court to consider; only what actually occurred.  The law is clear, it is

---

[52] *Blake*, *3* A.3d at 1083 (stating that "[t]his Court has consistently and unequivocally held a witness' statement may be introduced only if the two-part foundation is first established.").
[53] State's Response Brief at 10.
[54] *Blake*, 3 A.2d at 1083 (holding that the "erroneous admission of the five witnesses' statements under section 3507 without a proper foundation requires Blake's convictions to be reversed unless those errors were harmless.").
[55] State's Resp. Br. at 11.

the proponent's burden to establish a complete and proper foundation *before* seeking to admit a statement under § 3507, arguing it could have been done, *post hoc*, is inadequate.

It is apparent that Trial Counsel understood the general foundational issue as evidenced by his attempt to bar the admission of Rosetta Sudler's § 3507 Statement on the question of voluntariness. In his Affidavit, Trial Counsel acknowledges that he did not object on the basis of truthfulness, and stated that he "felt at the time that the other foundational requirements for the admissibility of the statements had been met and I was intent on effectively cross-examining the witnesses." Trial Counsel also expressed concern that had he objected, and been overruled, he would have potentially lost creditability with the jury.

The Court notes that Trial Counsel was very well prepared and his cross-examinations were highly effective. However, the Court is not persuaded by the argument that Trial Counsel would have lost creditability with the jury had he objected and been overruled. In fact, the trial transcript reveals that Trial Counsel was not afraid to object and did frequently, at times with great success.

Finally, Trial Counsel stated in his Affidavit that "at the time this trial took place, the law on prior voluntary out-of-court statements was more favorable to the State than it is now." The Court notes that the statutory language of 11 *Del. C.* § 3507 was no different in 2003 than it is today. And, more importantly, the fact remains that the Delaware Supreme Court's rulings in *Keys*, *Ray*, *Moore*, and *Feleke*, were all in existence prior to the trial in 2003. While *Blake* is a 2010 case, its holding did not create any new law or condition predicate for the admission of § 3507 statements; it simply applied the law as it existed, since inception, to the case before it.

14

Viewing Trial Counsel's performance objectively and with all possible deference, there appears to be no reasonable tactical explanation for Trial Counsel to have *not* objected. Trial Counsel conducted an adept and skilled flank-attack on the § 3507 statements by attacking the various witnesses' creditability, memory, observations, motives and inconsistent testimony. However, Trial Counsel seems to have missed the frontal-attack available to him on the foundational issue of truthfulness.

The importance and impact of the § 3507 statements to the outcome of Flowers' trial is hard to overstate. Much like the facts in *Blake*, without the § 3507 statements, the State's case against Flowers was far weaker. The § 3507 statements constituted the bulk of the evidence against Flowers. Not that such evidence is required for a conviction, but the record reveals that no gun was recovered, no ballistics tests were conducted, no fibers were collected or tested, no fingerprints were lifted, and no DNA was compared. The State did not present any physical evidence other than the autopsy findings, various photos and maps, for a total of 35 Exhibits.[56] The eyewitnesses presented by the State were forgetful, uncooperative and gave conflicting and inconsistent testimony, to say the least.

In light of the significance of the five § 3507 statements to this case, and no evidence of any reasonable trial-strategy based reason to have *not* objected, the Court finds, by a preponderance of the evidence, that Trial Counsel's representation was objectively unreasonable and therefore deficient under the first prong of *Strickland*.

### 2. Prejudice Analysis under *Strickland*

Having determined that Trial Counsel's representation was deficient, the Court must now determine if but for Trial Counsel's professional errors "the result of the

---

[56] Criminal Trial Activity Sheet, Docket ID. 77.

15

proceeding would have been different." To prevail on this prong of *Strickland*, Flowers is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Reasonable probability for this purpose means a probability sufficient to undermine confidence in the outcome."[57]

Therefore, the question becomes: is there a reasonable probability that without the § 3507 statements the outcome of the case would have been different? In this case, unlike *Blake*, there was some live in-court (non-§ 3507) testimony that inculpated Flowers, necessitating a more detailed review and analysis than was needed in *Blake*. It is impossible to know what any given jury might have done without the § 3507 statements, but it is possible to closely scrutinize the live in-court testimony to determine if a reasonable trier of fact would have acquitted Flowers without the § 3507 Statements.

### Live In-Court Trial Testimony

Testimony from three of the witnesses, Tysheik McDougall, Othello Predeoux and Rosetta Sudler, absent their respective § 3507 statements, failed to inculpate Flowers.

Tysheik McDougall made it clear during her in-court testimony that while she did know Flowers as "Moan" she testified that she "didn't see anything[,] I wasn't there[,] I wasn't there, so I didn't see anything."[58] McDougall also testified on direct that the "shooting happened on 22nd Street, I'm on 23rd Street. I don't got bionic eyes or something. I can't see around no corners. I was not a witness to anything."[59] Absent McDougall's § 3507 statement, her testimony is largely irrelevant.

---

[57] *Swan v. State*, 28 A.3d 362, 384 (Del. 2011) (internal quotations omitted).
[58] Tr. of McDougall at 45.
[59] *Id*. at 158–159.

16

Othello Predeoux was a jailhouse informant who was not interviewed by police until July of 2002, while incarcerated in Symrna, Delaware. His live testimony also failed to implicate Flowers as the shooter. Predeoux testified that he talked to Detective Brock about an incident that happened back in 1998 and it involved Flowers. Predeoux stated, "I just remember it was some shooting and somebody got killed." However, when asked on direct examination if he knew who was shooting, Predeoux replied, "Nah, I didn't see who was shooting, it was a whole bunch of people. I couldn't really decipher where it was coming from."[60] Thus, without Predeoux's § 3507 statement, the substance of Predeoux's in-court testimony was that he was present at the time for the shooting but did not see who the shooter was.

Finally, the trial transcript reveals that Rosetta Sudler was a combative and uncooperative witness who was high on drugs at the time of the incident. Absent her § 3507 statement, however, Sudler never implicated Flowers as the shooter during her in-court testimony.

The remaining two witnesses, however, offered live in-court testimony that inculpated Flowers as the shooter. The first was 16 year-old Matthew Chamblee. Trial testimony indicates that Chamblee was shown two photo-arrays of suspects (for a total of 12 pictures) and selected Flowers' picture as the shooter. The critical aspects of his direct-testimony, in pertinent part, are as follows:

> Q: [by the prosecutor] Did you see anyone get shot that night?
>
> A: [by Chamblee] I didn't see nobody get shot, but I seen some shots fired.[61]

---

[60] Tr. of Predeoux at 70.
[61] Tr. of Chablee, 72.

*       *       *

Q: Okay.  You say that you did see someone shot that night?

A: I seen a person wearing something black, but I ain't never seen the person who's face—I just see shades and it looks like one of those beanie hats or something.

Q:  Shades and a beanie hat?

A:  Yes.

Q:  Do you recall what kind of shades?

A:  They looked like they was kind of yellow, wide shades.[62]

*       *       *

Q:  Did you see who was doing the shooting?

A:  Actually, I didn't see the person, but I can tell with the beanie hat and glasses the person who was doing it—what the person was doing.[63]

*       *       *

Q:  And do you remember what the lighting conditions were that night? Could you see it clearly or not?

A:  Not clearly.

Q:  And could you see the person holding the gun?

A:  Yes.

Q:  Okay.  And did you recognize the person holding the gun?

A:  Yes.

Q:  Is that person in the courtroom today?

A:  Yes.

Q:  Where is he?

A:  Sitting over there [identifies Flowers].[64]

---

[62] *Id.* at 73.
[63] *Id*. at 81.
[64] *Id*. at 82.

18

At the conclusion of Chamblee's direct examination, the State played his § 3507 statement for the jury. Upon cross-examination by Trial Counsel, Chamblee gave the following testimony:

> Q: But do you allow for the possibility that you could be mistaken about [the identification of the shooter]?
>
> A: It is a possibility.
>
> Q: That you might be mistaken about that?
>
> A: Slight possibility.[65]

On recross-examination Chamblee testified as follows in response to Trial Counsel's questions:

> Q: So I take it if we can boil this whole thing down based upon everything you've said in response to [the prosecutor's] question you're saying that the shooter could be [Flowers]?
>
> A: Could be.
>
> Q: You're also saying that the shooter could not be [Flowers]?
>
> A: Right.
>
> Q: And that's the degree of your certainty?
>
> A: Right.[66]

Cross-examination by Trial Counsel also elicited that Chamblee was mistaken regarding the presence of street lights on the street the night of the shooting and that Chamblee actually did not know personally or hang-out with the victim of the shooting, despite his prior day's testimony that he in fact did.[67] Thus, without the §3507 statement,

---

[65] *Id*. at 97.
[66] Oct. 25, 2003 Tr. of Chamblee at 29.
[67] Id. at 30.

19

a jury would be left with a witness that identified Flowers as the shooter, but one who admitted he could not see clearly on the night of the shooting, did not see the shooter's face, and ultimately admitted he could just as equally be mistaken.[68]

The second witness, Vernon Mays, testified on direct examination that he did not see who shot the gun. Mays stated, "I just faintly glanced at a couple of people, but I can't really tell you I saw a lot, because mines was something like a five-second glance."[69] Mays also testified that he looked through "four trays" of "mug shots" before picking out a suspect. Mays testified that the person he picked-out "looked like the individual to me. But it is like I told him, [presumably Detective Brock] I really can't say 100 percent for sure."[70]

On cross-examination by Trial Counsel, Mays' ability to identify Flowers as the shooter simply unraveled. The following exchange is notable:

> Q:…you did not get a good look at the individual who fired the shots on August 1st of 1998; is that correct?
>
> A: That is correct.
>
> Q: Okay. And if I understand what you said yesterday, it is my understanding that what you're saying is that the person who's photograph you picked out and the person who is sitting in the court at this time looks like or resembles the shooter?
>
> A: That's correct.

---

[68] Most of the cross-examination in this case touched upon the content of the various § 3507 statements. By operation of law, Trial Counsel was not afforded an opportunity to cross-examine a witness regarding his or her live in-court testimony until after the § 3507 statement was played for the jury, usually at the conclusion of the direct examination by the State. *See Smith v. State*, 669 A.2d 1, 8 (Del. 1995). Therefore, the Court has considered all of the cross-examination in reaching its conclusion. The Court cannot reasonably parse-out what Trial Counsel would, and would not have asked, if the § 3507 statements had not been introduced in the first place. Logic dictates, however, that if a witness did not identify Flowers or offer inculpatory testimony on direct, Trial Counsel may not have conducted any cross-examination. Once a § 3507 statement was introduced, Trial Counsel was then forced to conduct cross-examination to attack the contents of that statement and the live in-court testimony—damaging or not.

[69] Oct. 22, 2003 Tr. of Mays at 63.

[70] *Id*. at 66.

Q: You have to speak up, please.

A: That's correct.

Q: You are not saying, if I understand you, correctly, that he is the shooter, are you?

A: No, sir. I can't say that one hundred percent, no.

Q: In fact, you're really not sure, are you?

A: No, not really.

Q: As you sit here today?

A:Yes.[71]

Mays also testified, in contradiction of Chamblee's testimony, that the shooter was not wearing a hat or yellow tinted glasses.[72] Finally, Mays offered confusing testimony on cross-examination regarding his § 3507 statement about the person he picked out from the police photos. Mays stated that the person in the photo he selected was someone he knew to be a high school track or football star the last time he was home on leave from the Army, in 1983 or 1984. The problem with Mays testimony on this point, as pointed out by Trial Counsel, was that Flowers was only seven years old in 1983.[73]

At the close of its case-in-chief, the State offered one final witness who was not a witness to the shooting, Adrienne Dawson. Dawson is Flowers' sister and she testified that Flowers had lived with her in her house "off and on for years" prior to the shooting. She also testified that after the date of the shooting, August 1, 1998, Flowers never came

---

[71] *Oct. 23, 2003* Tr. of Mays at 18.
[72] *Id*. at 28–29.
[73] *Id*. at 42–45.

back and lived with her.[74] According to testimony from Detective Brock, Flowers was subsequently located living in North Carolina in November of 1999 and was extradited to Delaware in February of 2000.[75] Based on this information, the State argued flight as identity and conciseness of guilty on Flowers' part. However, Flowers' whereabouts between those dates is unknown. Dawson and Detective Brock's testimony also reveals that Flowers did not have a very stable or permanent address in Delaware prior to the shooting, or exactly when he went to North Carolina.[76] Thus, while this information is certainly relevant and somewhat probative of Flowers' guilt, it is far from concrete evidence of deliberate flight or proof of guilt.

## Conclusion

The legal standard the Court must use when reviewing Flowers' claim is worth highlighting, as it shapes the outcome. *Strickland* explicitly rejects the higher, preponderance of the evidence standard of proof used under the first prong, and instead, adopts a lower, reasonable probability standard of proof for the second prong.[77] Consequently, Flowers is only required to show a "reasonability probability" that the outcome would have been different to gain relief under the second prong of *Strickland*. Thus, while a jury, hearing only the direct testimony and cross-examination of Chamblee, Mays and Dawson may have still returned a guilty verdict; there is also the very real likelihood that a jury, hearing that same testimony, would have reached a different conclusion.

---

[74] Tr. of Dawson at 173–176.
[75] Tr. of Detective Brock at 33–34.
[76] Tr. of Detective Brock at 33; Tr. of Dawson at 175.
[77] *Strickland*, 466 U.S. at 693–694.

22

The prejudice analysis under *Strickland* is analogous to a harmless error analysis, and is thus instructive. In the line of § 3507 cases leading up to and including *Blake*, the Delaware Supreme Court has applied a harmless error analysis in the context of an incomplete § 3507 foundation. The legal standard for this analysis was recently reiterated by the Delaware Supreme Court. In *Hansley v. State*, the Court explained that:

> When reviewing claims for harmless error, the reviewing court considers the probability that an error affected the jury's decision. To do this, it must study the record to ascertain the probable impact of error in the context of the entire trial. As a result, any harmless error analysis is a case-specific, fact-intensive enterprise. This approach indicates that the reviewing court must consider both the importance of the error and the strength of the other evidence presented at trial.[78]

After closely examining the trial transcripts, it is clear to the Court that the non-§3507 testimony was far from overwhelming or convincing. Given the high burden of proof in a criminal case, and distinct lack of other evidence, the Court must conclude that Trial Counsel's error was prejudicial and not harmless beyond a reasonable doubt. If the non-§ 3507 testimony was more reliable, or there was other corroborating evidence, then the prejudice created by the erroneous admission of the § 3507 statements may have been mitigated, and the Court's holding in this regard might well be different.

Nonetheless, because a fundamental constitutional violation occurred in this case, and in light of what little other evidence was available to the jury, the Court is not confident in the reliability or integrity of the underlying conviction in this case. In the Court's opinion, based on the testimony presented at trial and the lack of other physical or corroborating evidence, it is entirely reasonable, and probable, to see how a jury *would* have acquitted Flowers in the absence of the five § 3507 statements; the in-court testimony was simply to equivocal. Thus, the Court is satisfied that the second prong of

---

[78] *Hansley v. State*, 104 A.3d 833, 837 (Del. 2014) (internal quotations and citations omitted).

23

*Strickland* is also satisfied—had the § 3507 statements not been presented at trial, there is a *reasonable probability* that the outcome would have been different.

Accordingly, Flowers should be granted relief on this claim.

## Second Claim

Flowers next alleges that Trial Counsel was ineffective for failing to object to the admission of the five § 3507 statements because they were cumulative to the in court testimony of the witnesses.

While parts of the § 3507 statements were arguably cumulative of the in-court testimony, the critical aspects of the statements, as previously noted, certainly were not. In any event, an objection as to admission of the § 3507 statements as cumulative would have been in contravention of the plain-language of the statute. Furthermore, as Trial Counsel and the State pointed out in their briefing, the state of the law governing cumulative § 3507 statements was not as developed in 2003 as it is today. It is not until 2012, in *Richardson v. State*, that the groundwork for an objection on this basis is clearly delineated.[79] In *Richardson*, the Delaware Supreme Court noted, albeit in dictum, that a cumulative § 3507 statement would be subject to exclusion on that ground, and that § 3507 does not "trump" all other rules of evidence.[80] Therefore, it was not unreasonable for Trial Counsel to have not objected on this basis in 2003. Accordingly, this claim is without merit.

## Third Claim

Flowers' third claim is that Trial Counsel was ineffective for allowing the jury to have the recorded § 3507 statements in the jury room during deliberations.

---

[79] 43 A.3d 906 (Del. 2012).
[80] *Id*. at 909.

Setting aside any procedural bars to this claim, it is without merit for two reasons. First, at the time of Flowers' 2003 trial, *Flonnery v. State* was still three years away. In *Flonnery*, the Delaware Supreme Court first announced the "default rule" that § 3507 statements do not go back to the jury during deliberation. [81] Second, Flowers can only offer speculation that the jury actually viewed the § 3507 statements during deliberations. Without concrete evidence that the jury viewed and relied upon the § 3507 statements during deliberations, thus giving the § 3507 statements "undue emphasis and credence," any prejudice argument is nothing more than conjecture at this point.[82] This claim should also be denied.

### Fourth Claim

Flowers' fourth claim is that Trial Counsel was ineffective for failing to call five potentially exculpatory witnesses during the trial. The witnesses were:

### 1. Earl Bazemore

According to the Affidavit of Trial Counsel, Bazemore, who was only 11 years old at the time of trial, could not be located at the time of the trial, and even if he was available to testify, would not have been "overly exculpatory."[83] According to the State, Bazemore was shown a large number of suspect photographs, but was unable to identify the shooter. As noted by the State, this was not a case in which Bazemore identified another person as the shooter—he simply could not identify *anyone*. Additionally, and perhaps most importantly, it is unknown if Flowers' photograph was one of the photos that Bazemore even had the opportunity to view. As such, Trial Counsel cannot be faulted for not calling Bazemore as a witness, even if he could have been located.

---

[81] *See Flonnery v. State*, 893 A.2d 507 (Del. 2006).
[82] *Id*. at 526.
[83] Affidavit of Trial Counsel at 5.

### 2.  Michael Bartley

Bartley claims to have been standing next to Flowers at the time of the shooting. And, presumably, he would have testified that Flowers was *not* the shooter.  The problem with Bartley's story, among other things, is that he did not share it with anyone until 2012, while he was incarcerated with Flowers.  There is no evidence that Trial Counsel even knew of the existence of Bartely, much less his exculpatory observations, in 2003. Perhaps Flowers did not recall that Bartley was standing next to him at the time of the shooting until many years after the trial.  Plausible or not, Trial Counsel cannot be said to be deficient for failing to call a witness he did not even know existed at the time of the trial.

### 3.  Bruce Duncan

Duncan's presence at the scene of the crime was apparently unknown to Flowers and the State until he sent letters to the State indicating that Flowers was not the shooter. In these letters, Duncan stated that, for a price, he would tell the State who the shooter was.  Flowers now claims Trial Counsel was deficient for failing to call Duncan as a witness at his trial.

The problem with Duncan's testimony is twofold.  First, there is no evidence he was actually at the scene of the crime—he was not interviewed by police until December 19, 2001—while incarcerated on other charges.[84]   Secondly, Duncan was not offering this information as an unbiased Good Samaritan; rather, he was only willing to bargain it in exchange for his freedom.

---

[84] It is also worth noting that the murder in this case occurred on August 1, 1998.  Obviously, Duncan sat on this information until it was useful to him, a factor that would surely have hurt his creditability on cross-examination.

Finally, in his Affidavit, Trial Counsel noted that while he did not call Duncan as a witness, he "is quite sure at this time that such a decision was made for strategic reasons." The Court will take judicial notice of the fact that Trial Counsel has been a practicing attorney since 1975, and is one of the State's most prolific and experienced criminal defense attorneys. While it would be helpful to the Court's decision if Trial Counsel could recall a specific reason he did not call Duncan, it at least appears that Trial Counsel considered calling Duncan as a witness, but made a conscious decision not to. Additionally,

In light of the dubious circumstances surrounding Duncan's proposed testimony, and the fact Trial Counsel made a deliberate, but now forgotten reasoned decision not to call him, the Court has no concrete basis in the record to second-guess that decision almost twelve years later.

### 4. Marvin Swanson

According to both parties, Swanson gave two statements to the police. In one of the statements, made four years after the date of the incident, one of the shooters identified by Swanson may have been Flowers himself. Given this expected testimony, it is self-evidence Trial Counsel did not call Swanson as a witness – his testimony was a dangerous and unknown proposition.

### 5. Chermaine Mayo

Flowers claims that Trial Counsel was deficient for failing to call Mayo as a witness at trial. The record indicates that at the time of the trial, Trial Counsel understood Mayo to have *identified* Flowers as the shooter.[85] Flowers has since presented information to the Court that Mayo, in a taped statement made to the police,

---

[85] Witness #6, Detective Andrew Brock's police report, attached to Trial Counsel's Affidavit.

presumably on or about August 7, 1998, but not transcribed until 2011, actually did not identify Flowers as the shooter.[86] It is unclear, at this point at least, if Trial Counsel listened to, or even knew of, the recorded statement prior to trial. Trial Counsel states in his Affidavit that if the taped statement was made on the same date as the statement in the police report, it is inconsistent with the police report and it should have been provided to Flowers prior to trial. Based on the current state of the record, the Court is unable to conclude if the State committed a discovery violation at this point. In any event, in her recorded and transcribed statement, Mayo also told police that she didn't see the shooting and that other people told her that a person named "Joe" was the shooter.

In light of the apparent hearsay and inconsistent nature of Mayo's testimony, it is again apparent to the Court why neither party called Mayo as a witness at trial.

For the aforementioned reasons, the Court finds that Flowers' Fourth Claim is without merit and should be denied.

<u>Fifth Claim</u>

Finally, Flowers claims that Trial Counsel, who was also counsel for the first direct appeal, was ineffective for failing to raise claims one and three, as outlined above, on appeal. In light of the Court's ruling as to Flowers' first claim, this argument does not need to be addressed.

---

[86] December 18, 2014, Supplemental letter from Rule 61 Counsel.

## VII. CONCLUSION

For the foregoing reasons, Flowers' Motion for Postconviction Relief should be

**GRANTED**.


**IT IS SO RECOMMENDED.**



_/s/ Bradley V. Manning_
Bradley V. Manning,
Commissioner

oc:   Prothonotary
cc:   Defendant